

FILED

JAN 1 2 2012

U.S. COURT OF
FEDERAL CLAIMS

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |
|---|---|
| NEIL F. KEEHN, | ) |
|       Plaintiff | ) |
| v. | ) |
|  | ) |
| THE UNITED STATES | ) |
|       Defendant. | ) |

CASE NO.

JUDGE:  **12 - '27 C**

**CLAIM FOR COMPENSATION FOR**

**GOODS AND SERVICES PROVIDED TO**

**THE DEPARTMENT OF DEFENSE AND**

**VARIOUS INTELLIGENCE AGENCIES**

RECEIVED

JAN 1 2 2012

OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................3

INTRODUCTION.......................................................................11

PARTIES...............................................................................15

JURISDICTION AND VENUE..................................................... .15

STATUTE OF LIMITATIONS.......................................................16

DEFINITIONS.........................................................................16

METHODOLOGY FOR COMPUTATIONS OF SPECIFIC CLAIMS.............17

FACTUAL BACKGROUND...........................................................18

DESCRIPTION OF TASKS THAT LED TO FUNDED PROGRAMS.............20

DESCRIPTION OF COMPLETED TASKS RELATED TO NATIONAL

    POLICY AND GUIDANCE DEVELOPMENT......................................32

SUMMARY OF FUNDED PROGRAMS FOR WHICH COMPENSATION

IS SOUGHT...........................................................................66

SUMMARY OF NATIONAL SECURITY POLICY AND GUIDANCE

    COMPLETED TASKS FOR WHICH COMPENSATION IS SOUGHT......66

MONETARY SUMMARY OF TOTAL CLAIM.......................................69

SUMMARY OF CLAIM...............................................................69

PRAYER FOR RELIEF...............................................................73

VERIFICATION.......................................................................75

LIST OF EXHIBITS..................................................................76

EXHIBITS..........................................................................E-1

## TABLE OF AUTHORITIES

### Preamble

**A1.** Plaintiff is not a lawyer, and does not seek to act like one. Therefore, his Table of Authorities might be unconventional, and he therefore prays for the Court's indulgence. All of the following citations are directly or indirectly related to the Claim presented herein.

### United States Constitution

**A2.** Plaintiff alleges defendant took plaintiff's intellectual property without just compensation in violation of the Takings Clause of the Fifth Amendment to the Constitution. The Fifth Amendment provides in part that "private property [shall not] be taken for public use, without just compensation." United States Constitution, Amendment V. The Constitution further states that "[N]or shall private property be taken for use without just compensation." While courts have wrestled with whether or not this includes intellectual property, recent legal scholarship as well as judicial decisions strongly suggests that that it in fact does. Ruckelshaus v. Monsanto Co., 467 U.S. 986 (1984), and Philip Morris v Reilly.4 312 F3d 24 (1st Cir 2002.

**A3.** General elements of a taking claim are: (1) a state actor, (2) duly authorized by law, (3) effects a taking, (4) of private property, (5) for a public use. Plaintiff's Claim satisfies each of these required elements. Another way to express the elements of a Takings claim is by addressing the following questions: (1) Has private property been taken? (2) If so, was there some justification for that taking under the police power? (3) If not, was the taking for a public use? And (4) if so, has just compensation been provided? Again, Plaintiff asserts that in the Claim contained herein, the Court will see that all elements, as expressed in this form, lead to the conclusion that Plaintiff is due just compensation for the thirty-one (31) tasks for which he lays claim.

## Legal Doctrine

**A4.** Plaintiff has a case of centered upon lack of compensation for a series of enforceable implied-in-fact task-order contracts. As a result, two legal doctrines provide the basis for Plaintiff's Claim: unjust enrichment and quantum meruit. Plaintiff could have based his Claim on yet another equitable doctrine, quantum valebant, but determining the monetary worth of National Security Policy and Guidance documents is a perilous exercise indeed, as opposed to an estimated value of both Plaintiff's opportunity and accounting costs necessary in a quantum meruit-based claim.

**A5.** Unjust enrichment is a general equitable principle that no person (or organization) should be allowed to profit at another's expense without making restitution for the reasonable value of any property, services, or other benefits that have been unfairly received and retained. Various courts throughout Western history have established the elements of a cause of action for unjust enrichment. These elements are: (1) the enrichment of the party accused of unjust enrichment; (2) that such enrichment was at the expense of the party seeking restitution; and (3) the circumstances were such that in equity and good conscience restitution should be made. An additional requirement is that the party accused of unjust enrichment must know of the benefit conferred; to ensure that the benefit was not foisted on the recipient, and is something for which compensation is reasonably expected. A careful reading of the description of each of the tasks completed by the Plaintiff that then have been funded by the United States Government will attest to the fact that each element of unjust enrichment has been satisfied.

**A6.** Quantum meruit is likewise an equitable doctrine, and means "as much as deserved.", and it is derived from the doctrine of unjust enrichment. Unjust enrichment is that which is obtained,

while quantum meruit is "as much as deserved", and serves as a measure of liability from an implied-in-fact contract.

In a manner similar to unjust enrichment, Courts have crafted four basic elements that the plaintiff must prove before he may recover under the doctrine of quantum meruit: (1) that valuable services were rendered; (2) that the services were rendered to the defendant; (3) that the services were accepted, used, and enjoyed by the defendant; and (4) that the defendant was aware that the plaintiff, in performing the services, expected to be paid by the defendant. For those tasks described in this Claim that contributed United States National Security Policy and Guidance, it is shown that all elements of quantum meruit have been met.

**A7.** To reiterate, cases that relied upon these doctrines are listed under Precedents. The specific projects associated with individual claims articulated herein fall into two categories: those that became funded programs, and those that contributed to United States National Security Policy and Guidance. The first category is covered by the unjust enrichment doctrine, and the second category by the quantum meruit doctrine. Since from a legal prospective it appears to the Plaintiff that each project under each category are legally equivalent, it does not make sense to the Plaintiff as a non-lawyer to attempt to ascribe individual precedents to individual projects. Therefore, he simply lists the precedents below that he believes have legal connection to his Claim. The same argument is made for all other citations in his Table of Authorities.

### Judicial Decisions

**A8.** The Claim presented herein is based upon a series of enforceable implied-in-fact task order contracts. Courts have determined the elements of implied-in-fact contracts. An implied-in-fact

contract requires all of the elements of an express contract: (1) mutuality of intent to contract; (2) consideration; (3) an unambiguous offer; and (4) an unconditional acceptance. An implied-in-fact contract differs from an express contract

in that the existence of the implied-in-fact contract must be inferred from the conduct of the parties. City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990), cert. denki, 501 U.S. 1230 (1991). Lewis v. United States, 70 F.3d 597,600 (Fed. Cir. 1995) (citing Baltimore & Ohio R.R. Co. v. United States, 261 U.S. 592, 597 (1923).

The facts of the Claim presented herein clearly indicate that both parties to the Claim have met all elements of an implied-in-fact contract.

**A9.** Furthermore, an implied-in-fact contract arises when, in the absence of an express contract, the parties' behavior leaves no doubt that what was intended was a contractual relationship permitted by law. Trauma Serv. Group v. United States, 104 F.3d 1321, 1326 (Fed.Cir. 1997). The same elements of express contracts, such as mutuality of intent and lack of ambiguity in offer and acceptance are required in implied-in-fact contracts. Fincke v. United States, 675 F.2d 289, 295 (Ct. Cl. 1987). Said elements were satisfied by both the Plaintiff and the Government in the enforceable implied-in-fact task order contracts described in the Claim presented herein.

## Statutes

**A10.  28 USC 1498**

This statute explicitly provides a remedy for the holders of a patent or copyright that is used without license by the United States Government. Said remedy permits the patent or copyright holder to seek relief in this Court. Given that patents and copyrights are two types of intellectual property, Plaintiff asserts that the intellectual property that is the subject of this Claim is likewise

intended to be covered by this law since his intellectual property could be either patented or copyrighted.

**A11. 10 USC 2304a-d**

This statute covers task order contracts, and is fully applicable to the circumstances under which Plaintiff provided intellectual property in fulfillment of specific tasks for the Department of Defense. It is applicable to all of the 31 tasks that Plaintiff performed for the Department of Defense and various intelligence agencies, and is thus cited here only.

**A12.  50 USC 1431**

This statute makes clear that the United States Government may enter into contracts that support the national defense that are enforceable contracts and for which monetary compensation is paid.

**A13. The Tucker Act (28 USC 1346)** that goods and services procured for national defense, are done so under enforceable contracts for which the Government expects to pay monetary compensation.

The Tucker Act covers several legal circumstances, including the instance in which a plaintiff believes the United States Government owes him money. Thus, the Tucker Act applies in Plaintiff's Claim, as explained herein.

**A14. The McNamara-O'Hara Service Contract Act (50 USC 1432),** which sets wage rates and other labor standards for employees of contractors furnishing services to the federal government, and thus is applicable to the issues of non-compensation raised in this Claim. Since task order contracts can be based upon an hourly rate, this Act applies to Plaintiff's case.

**A15. The Walsh-Healey Public Contracts Act (41 USC 35)** requires payment of minimum wages, and other labor standards by contractors providing materials and supplies to the federal government. Since the work that led to the intellectual property that, in turn, satisfied the

requirements of the tasks described in this Claim was performed under a series of enforceable

implied-in-fact task order contracts, it applies to the issues raised in this Claim.

**A16. Contract Disputes Act** (41 USC 601)

The Contract Disputes Act addresses the role of a contracting officer in disputes relating to

formal, explicit contracts, and thus is not applicable to the issues raised in this Claim.

**A17. Fraud in the Inducement** (18 USC 665)

Plaintiff dealt with many fine United States Government employees in the tasks that are the

subjects of his Claim. Plaintiff believes that most of these people acted in good faith, and

therefore he completed the tasks for which he now seeks compensation on the explicit

understanding that he would eventually receives contract(s) for the expansion of the tasks

described herein. This never happened, and thus it can be argued that Plaintiff was the subject of

unintended fraud in the inducement. This argument applies throughout this Claim where the

circumstances of each completed task are described should the filing of a criminal case be

deemed warranted.

### Rules and Regulations

**A18.** There are numerous rules and regulations, in the Federal Acquisition Regulations, for

example, (codified in Title 48 of United States Code) that refer to compensation issues, thus

implying that those that provide goods and services to the United States Government are, in fact,

compensated for same. This circumstance is also a matter of public policy under contract law.

(17 Am JuR. 2D Contracts § 238, at 241 (1991)). To not provide compensation where it is

warranted by common sense is also a part of that public policy. Rather than attempt to cite

specific rules and regulations that govern the Claim presented herein, Plaintiff simply points out

this basic fact. That said, Part 31 of the Federal Acquisition Regulations addresses numerous

issues relating to costs, thus implying that the Government does in fact pay for the goods and services that it receives, and this fact applies throughout Plaintiff's Claim.

### Precedents

**A19.** Plaintiff has researched numerous cases, both from this Court as well as from various other federal courts that cite the legal doctrines of unjust enrichment and quantum meruit. While there have been an untold number of cases where a plaintiff has sought monies from the United States Government under these doctrines, Plaintiff has failed to find a cases that is directly on point vis-à-vis his case. Nonetheless, by deductive reasoning, the following cases have a legal connection to his case in the manner described.

Int'l Data Prods. Corp. v. United States, 70 Fed. Cl. 387, 394 (2006) (citing Int'l Data Prods. Corp. v. United States, 64 Fed. Cl. 642, 650-51 (2005))

"[w]here a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a quantum valebant or quantum meruit basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity. The contractor is not compensated under the contract, but rather under an implied-in-fact contract." United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1329-30 (Fed. Cir. 2006).

. United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1329-30 (Fed. Cir. 2006).

Gould, Inc. v. United States, 935 F.2d 1271, 1272 (Fed. Cir. 1991)

Stevens Van Lines, Inc. v. United States, Court of Federal Claims, Case Nos. 05-1278 (consol.)

Riviera Finance of Texas, Inc. v. United States, Court of Federal Claims, Case No. 02-737 C

**A20.** Plaintiff cites the following AT&T cases with trepidation. While Plaintiff AT&T was not successful in its pursuit of compensation under the doctrines of quantum meruit and unjust

enrichment, these cases raise issues not unlike those raised in the Claim herein, in that AT&T provided highly valuable assets to the Government for which it was not compensated. Irrespective of the fact that the legal aspects of this Claim and that of AT&T's are very different, the dissenting opinions in these cases, for example, raise issues that are highly relevant to the Claim herein, in that the lack of compensation for goods and services rendered presents issues of common sense fairness, regardless of legal technicalities.

American Telephone & Telegraph v. United States, 32 Fed. Cl. 672, 682-83 (1995). ("AT&T II")

>    The court held, however, that the contractor might be entitled to the remedy of quantum
>    meruit, measured by the value of goods and services received by the Government.
>
>    American Telephone & Telegraph v. United States, 32 Fed. Cl. 672, 682-83 (1995).

American Telephone & Telegraph Co. v. United States, 177 F.3d 1368 (Fed. Cir. 1999) (en banc) ("AT&T Ill")h

Am. Tel. & Tel. Co. v. United States, 48 Fed. Cl. 156, 160 (2000) ("AT&T IV").

Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1377 (Fed. Cir. 2002) ("AT&T V")

Gould v. United States, 67 F.3d 925, 928 (Fed. Cir. 1995)

### INTRODUCTION

**1.** This Claim is based upon a precept that is as old as humankind itself: a man is worth his daily bread. This Court is being asked to decide whether or not the United States Government (hereinafter Government) is obligated: 1) to compensate those who provide it goods and services, and 2) to be ultimately responsible for the equitable treatment of the employees of defense contractors in monetary matters.

**2.** In 1970, armed with a bachelors degree in mathematics, and a masters degree in electrical engineering, Plaintiff decided to devote his career to national defense. While this resulted in a huge mistake on his part, over a period from 1975 until 1992, he became **solely** responsible for technological innovations that have generated an estimated **$8.7B,** yes, **billion,** in corporate revenues, that continue to grow to this very day.

**3.** These innovations became funded programs in the defense and intelligence arenas, and while Plaintiff is certain that they have resulted in the creation of hundreds, if not thousands, of jobs, he has not benefited from his own work in any material manner whatsoever. Indeed, Plaintiff has been told by people over the years how lucky he was to have been able to spend so much time on his "hobbies." This was said because most of the intellectual property that is the subject of this Claim that resulted in the technological innovations described below was generated on his own time without any payment for his time or materiel.

**4.** For example, at **Northrop Grumman Corporation** most of the people that Plaintiff worked for told him repeatedly that since he enjoyed his work so much, he should be working 24/7, and, if there was any justice in the world, he would be paying them for the honor and the privilege to do so. But this wasn't the first employer that Plaintiff had had that had spewed such nonsense. If there is a defense company in this country that is a good employer for those who seek an honest

day's pay for an honest day's work, Plaintiff does not know of it. They're all the same, just horrible places to work for those employees responsible for getting the work done.

**5.** Still others, both people in the defense industry as well as uniformed military officers, told Plaintiff that the honor and the privilege for him to do the work for which they then received the benefits nearly defies human comprehension. As a result, Plaintiff is 63 years-old, not in good health either physically or financially, and he seeks compensation for thirty-one (31) tasks that he did on his own time, and, while he received promises of compensation from several well-intentioned military officers, he also received threats from others. The bottom line is that Plaintiff never received any monetary compensation for the intellectual property that has led to billions of dollars in corporate revenues for the defense industry as well as valuable contributions to national security policy and guidance for the Government.

**6.** At this point, let's be clear about the concept of one's "own time". It is standard in this country to work 40 hours per week for the salary that is provided to the employee. If a situation arises in which more than 40 hours are required, such as when a proposal is being prepared, employees, usually engineers, often work much longer hours. There are two recognized remedies for this circumstance. The most widely one is to allow the employee to take compensatory time off to offset the time that the employee worked for more than 40 hours in a week once the task is completed. The alternative policy is to put the employee on paid overtime.

**7.** But the defense industry frowns upon both of these policies for those engineers that are highly productive. In the case of such employees, the implicit, if not explicit policy is for the highly productive engineer to be prepared to work as many hours per week as his or her management demands, without any compensation other than his or her weekly salary. For such individuals, the concept of one's "own time" simply does not exist, and Plaintiff was warned on several

occasions in the 1970s not to assert that he possessed his "own time." Of course, demanding a 24/7 workweek violates federal law under the McNamara-O'Hara Act, but it was nonetheless accepted practice for those few engineers in any given organization who were held responsible for getting the work done.

8. For those who were lazy sycophants, management didn't care whether they ever did any work because at the very least, such people generated overhead revenues, which helped pay for management. This is one reason that national defense is so expensive.

As a result of this environment, and at the urging of the Strategic Air Command, Plaintiff attempted to establish his own company. Complete details regarding this endeavor are found in the uncompensated task descriptions presented below.

9. Plaintiff did his due diligence prior to launching off on his own. On Saturday, September 27, 1980, Plaintiff took a red eye to Washington where he spent the following Monday through Thursday briefing relevant senior Air Force officers and Office of the Secretary of Defense people on his business model. To a man, each **strongly** encouraged Plaintiff to proceed, and they agreed to assist him in any manner possible. One senior Air Force member, then-**Colonel E. S. Van Inwegan (and later a Brigadier General)** recommended that Plaintiff be one of the presenters at the annual Air Power symposium held at the Air War College at Maxwell AFB, Alabama. (See **Exhibit 1.**) Plaintiff thus gave a compensated presentation, and as a result was offered a faculty position in military strategy at the Air War College. This offer had to be withdrawn when the department chairman learned that Plaintiff did not possess a doctorate degree.

10. In October 1980, upon the recommendation of a prominent Beverly Hills businessman, Plaintiff developed and then presented his business model description to a number of "old heads"

that had spent a lifetime each in the defense arena. Included among these gentlemen was the late retired Air Force **Major General Dave D. Bradburn.** Plaintiff knew the general well from the years in the late '70s when General Bradburn had been the representative of the Joint Chiefs of Staff to the Helsinki negotiations on space arms control, and Plaintiff provided the general with analytical support.

**11.** Upon hearing Plaintiff's business model, the general proclaimed that Plaintiff was going to going to totally destroy his career because "every word out of your mouth screams cost effectiveness." When Plaintiff agreed that this assessment was true, the general explained that "The System" tells the world that it's interested in keeping the cost of national defense down, but, in reality, its interest is the exact opposite. He explained that officers in the military, and project managers in industry are promoted, given bonuses, etc. based upon the size of the budgets that they control, and that they attempt to destroy any efforts to lower the cost of accomplishing any particular mission. Plaintiff, without identifying the general, approached several very senior Air Force officials and told them of the general's input. They all vigorously disagreed with his assessment, and each strongly encouraged the Plaintiff to continue to propose ways and means of getting costs down. But in the end, it is clear that General Bradburn had correctly characterized the National Security Establishment.

**12.** So while the National Security Establishment spends the taxpayers money in a very lavish manner, at the same time it refuses to compensate some of those who generate intellectual property that leads to the solution of difficult problems relating to United States national security. Specifically, it discriminates against those companies that do not employ retired colonels. One of the objectives of this Claim is to determine if this practice constitutes codified legal doctrine. If

not, the Plaintiff is due the amount of money specified for his uncompensated contributions to United States national security.

**13. It is important to note that Plaintiff's Claim made herein has never been litigated by any court at any level.**

## PARTIES

**14.** The Plaintiff in this case is Neil F. Keehn, a 63 year-old career long defense engineer, strategic studies analyst and force structure planner. He has a permanent heart condition caused by overworking in a very stressful environment at defense contractor **Northrop Grumman Corporation.** Among his legal issues, he has a 20 year-old workers' compensation case in which at least two physicians have declared him totally disabled. Additional physicians may have declared him disabled, but his own attorney, **Lawrence Drasin,** destroyed all of the medical examination reports in his case file, and he is therefore unable to review these reports.

**15.** Plaintiff established **Strategic Systems Sciences** in 1981, and abandoned that corporation in 1990, at which point parties unknown to the Plaintiff assumed the corporate name. Therefore, Plaintiff is not responsible for any dealings that **Strategic Systems Sciences** may have had with any parties after 1990.

//

**16.** The Defendant is the United States of America.

//

## JURISDICTION AND VENUE

**17.** This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(b).

**18.** Venue is appropriate in this Court pursuant to 28 U.S.C. § 1491(b).

//

## STATUTE OF LIMITATIONS

**19.** The statute of limitations for cases filed in this good Court is six years. This makes perfect sense for the typical case heard by this Court, such as a tax case for a specific year. But in the instant case, the compensation sought is for goods and services provided to the United States as far back as 1976. However, Plaintiff alleges that he is not in violation of the statute of limitation because the United States is still funding updated versions of Plaintiff's original work to this day. Since various defense contractors as well as the United Sates continue to benefit from Plaintiff's original work, Plaintiff asserts that the statue of limitations has not expired.

//

## DEFINITIONS

**20.** In this Claim, the terms "space force structure" and "space force structure planning" are used. Definitions of these terms are in order. A space force structure consists of satellites; their ground stations; the launchers and launch facilities that are used to put the satellite in orbit; space surveillance systems that are used monitor satellites; and the communication systems that are used to connect all of these elements of the space force structure. A space force structure planner continuously addresses the questions what do we, as a nation, need?; why do we need it?; how do we get it (systems architecture)?; what can emerging technology do for us?; and, given all of the above, are there new operational concepts that make sense?

**21.** In 1980, when Plaintiff completed his self-designed doctoral program in force structure planning (**Exhibit 2**), the space force structure leadership in the uniformed Air Force assessed that there were only eight space force structure planners in the U.S. Force structure planning has much in common with investment banking. The development and analysis of both hedges and options, and strategic alternatives are common to both disciplines.

//

## METHODOLOGY FOR COMPUTATIONS OF SPECIFIC CLAIMS

**22.** Three different monetary considerations are used to compute specific claims associated with the thirty-one (31) tasks or funded programs described in this Claim. First is the assumed contract value of contracts that originated with intellectual value generated by the Plaintiff. In this regard, the Lehman formula is used to a compute finder's fee for each of Plaintiff's technological innovations that became funded programs. Plaintiff asserts that this is the proper method to compute his Claim in such instances. The Lehman formula is a longstanding method for determining compensation in the investment banking community for determining an investment banker's fee for finding capital for a client who has hired him or her to do so. Plaintiff asserts that, when he introduced a technological innovation to meet a critical national security requirement that the Government then funded, he was functioning in a manner analogous to an investment banker searching for capital. Thus, the Lehman formula is a very appropriate means of determining his just compensation.

**23.** The Lehman formula is expressed in the chart just below.

| Contract Value | Fee |
| --- | --- |
| First $1 million | Five (5) percent |
| Second $1 million | Four (4) percent |
| Third $1 million | Three (3) percent |
| Fourth $1 million | Two (2) percent |
| Everything over $4 million | One (1) percent |

**24.** Secondly, opportunity costs are employed to estimate the value of Plaintiff's compensation claim where no contract was extant, but should have been. In turn, there are two subsets of opportunity costs employed. First is the opportunity cost associated with the time in completing Plaintiff's self-designed doctoral program. The second type of opportunity cost was incurred in completing the task for which the Plaintiff was never compensated, and for which he now seeks compensation.

**25.** In addition to opportunity costs, Plaintiff claims accounting costs, and there are three subsets of this type of cost. First are his out-of-pocket costs associated with the acquisition of courseware materials for his doctoral program. Secondly are Plaintiff's out-of-pocket expenses for the production of his intellectual property that constituted the deliverables associated with a particular task (getting briefings and white papers typed, purchase of viewgraph materials, etc.). Finally, there are the Plaintiff's out-of-pocket costs for his travels to various locations nationally to interface with his customers.

**26.** Should anyone challenge Plaintiff's estimates of the revenues generated by his technological innovations or the money owed to him from the losses/damages identified for any one of the tasks described herein, he would be happy to submit his analyses to an unbiased but qualified valuation/compensation professional.


## **FACTUAL BACKGROUND**

**27.** The facts in this Claim are straightforward, and for which Plaintiff has proof that includes work product and letters of commendation. The reason for this Claim is that Plaintiff never received any monetary compensation whatsoever for goods and services that he delivered to the Government.

**28.** The United States Code (Titles 10, 31, 40, 41, 50), the Codes of Federal Regulations, The Federal Acquisition Regulations (especially Part 31) are replete with laws and regulations on compensation issues, which implicitly verifies that people are monetarily compensated when they provide goods and services to the Government.

**29.** Title 50 USC § 1431 makes clear that goods and services provided to the national security part of the Government are done so for monetary compensation. Other than in those explicit circumstances when someone volunteers his or her own goods and/or services, Plaintiff cannot find any laws or regulations governing his situation. That is, expecting goods and services to be provided to the Government with the explicit understanding that said goods and services are provided gratis without the provider's explicit consent.

**30.** The law implies that the Government expects to pay for those goods and services that it receives, again, absent an explicit agreement that no compensation is expected. That should include the goods and services provided by Plaintiff, and which are detailed in this Claim.

**31.** Plaintiff provided the Government with the goods and services described in this Claim with the understanding that it would promote his career, lead to funded programs for the company, **Strategic Systems Sciences**, that he owned, and a host of other benefits. But Plaintiff did not realize any of these expected benefits. He actually lost millions of dollars as the result of his undying devotion to national security. And there was never a shortage of people in the National Security Establishment who were quick to take advantage of his willingness to make sacrifices in the name of national security.

**32.** Plaintiff never told the Government that he was not interested in being compensated for the goods and services that he provided, and he never signed any type of waiver of his right to be compensated. Plaintiff gave his technological innovations, and his national security policy and

guidance development materials willingly with the expectation of receiving contracts in the future, either through his then-employer or through **Strategic Systems Sciences**. The Government agents with whom he dealt knew this very well, and they tried diligently to get him contracts for further work, as described herein, both when he was the sole proprietor of **Strategic Systems Sciences**, and when he worked for various defense contractors. **When generating the intellectual property that was used to satisfy the requirements of each particular task, as described in the Claim herein, Plaintiff was performing under a series of enforceable implied-in-fact task order contracts, all of which are subject to compensation.** The legal doctrines of unjust enrichment and quantum meruit provide the legal basis for the required compensation, as does the Takings clause of the Fifth Amendment to the United States Constitution.

**33.** The fact that these fine people were not successful in securing funding for Plaintiff's work should not accrue to the detriment of the Plaintiff, which it most certainly has.

**34.** When one part of the Government refuses to honor the commitments of another part of the Government, such as when Air Force Systems Command refused the Strategic Air Command's request to fund the Plaintiff, the ill effects of this lack of professional responsibility should not be borne by people such as the Plaintiff.

**35.** The fact that the Plaintiff did in fact suffer grievously as a result of Air Force Systems Command's lack of professional responsibility leads Plaintiff to file this Claim. In the end it is the Government that is legally responsible for its own commitments irrespective of which part of the Government a) made the commitment or b) decided not to honor it.

**36.** Details are provided below.

## DESCRIPTION OF TASKS THAT LED TO FUNDED PROGRAMS

**37.** 1. **Developed the Special Access Communication System (SACS)**

In the late 1980s, Plaintiff was working on a highly classified space system program (Project 0644) at **Northrop Grumman Corporation.** The Joint Chiefs required that a cover story be developed for this program due to its very sensitive nature. Plaintiff watched a group of retired military officers for two years attempt to develop a cover story that would satisfy the Government. Time and again their efforts were rejected for a variety of reasons. Finally, Plaintiff asked the **Northrop Grumman Corporation** manager of this task, **Larry Barlock,** if he could take charge of this task. To Plaintiff's surprise, Mr. Barlock was glad give the task away.

**38.** Using the principals of military deception, a military art and science that is thousands of years old, Plaintiff proceeded to develop a number of cover stories. (Plaintiff learned the military disciples of strategic deception and surprise during his self-designed doctoral program in force structure planning.) One option in particular stuck the Plaintiff as especially viable. This was the Special Access Communication System (SACS). SACS is a satellite communication system that is strictly for the use of Special Forces. It originated as a proposed secondary payload on the Project 0644 satellite as part of the cover story. When Project 0644 was cancelled at the end of the Cold War, SACS survived as a program in its own right. According to media reports, it was used in the military operation in which **Osama bin Laden** was killed.

**39.** Most of the managers on Project 0644 thought that the proposed SACS was a ridiculous concept. But its Government customer, given it understanding of military operations, liked the concept, and, without any support from **Northrop Grumman Corporation,** it was able to sell the SACS system concept to another classified part of the Government, who funded it. The initial **cost** estimate of the SACS when it was intended to be a secondary payload for the Project 0644

satellite was $40M. The actual price is unknown to the Plaintiff. The total cost of the program in its various manifestations is estimated to be $200M. Using the Lehman formula of shown above yields the Compensation Claim

**Compensation Claim: $2,120,000**

**40.** 2. **Developed Signal Demodulators for radar signal modulations unknown at reception.** In 1975, while working at the Space and Communication Group of the then-Hughes Aircraft Company, now **The Boeing Company**, Plaintiff worked on a task that was not part of any contract of **The Boeing Company.** Plaintiff became aware of a problem associated with signals intelligence (SIGINT), and decided to expand his technical knowledge base by attempting to solve this problem.

**41.** This problem was demodulating a received radar signal when a SIGINT receiver does not know the modulation on the radar signal at the time of reception. Such a signal is said to employ a pulse compression waveform. Working nights and weekends, Plaintiff was able to solve this critical national security problem.

**42.** **The Boeing Company** never demonstrated any interest in pursuing any new business opportunities associated with this technological innovation. It did not file a patent to protect its interests in these technologies. **The Boeing Company** did present Plaintiff a patent award for his linear frequency modulation pulse compression demodulator. But, it did not attempt to capitalize upon the technological breakthrough for his biphase modulation pulse compression signal demodulator. The **National Security Agency** recognized this device as "getting us out of a deep hole" vis-à-vis the monitoring of the Strategic Arms Limitation Treaty, commonly referred to as

SALT I. Plaintiff gave the design of this device to the National Security Agency in July 1976 with the permission of **The Boeing Company**.

**43.** In the development of this particular device, Plaintiff empirically solved a problem that some of the world's foremost mathematicians had been working on for decades. This is according to world-renowned mathematician and engineer **Dr. Solomon W. Golomb,** whom Plaintiff knew from a previous employer.

**44.** Also, the National Security Agency contacted several people when it did a background investigation on the Plaintiff as a result of this particular effort. Included among these individuals was one of Plaintiff's former professors, **Dr. Abraham Sinkov,** then one of the world's foremost cryptanalysts, and a retired National Security Agency executive. The National Security Agency told Dr. Sinkov that it considered Plaintiff's work to be exceedingly important. **In fact, the National Security Agency told The Boeing Company management that it would have given Plaintiff $100,000 if a legal means to do so could have been found.** And yet **The Boeing Company** was not interested in any new business associated with Plaintiff's intellectual property. Thus, neither **The Boeing Company** nor any other person or entity has any claims upon Plaintiff's intellectual property. Plaintiff's contact at the National Security Agency was **Dr. Herb Sawyer**.

**45.** In 1979, Plaintiff was informed by someone at **Science Applications, Inc**. that his mathematical breakthrough convinced the NSA that its principal encryption system for protecting satellite communication links was not as secure as previously assumed, and it moved quickly to implement an updated encryption algorithm. Without Plaintiff's mathematical breakthrough, the U.S. may have suffered a compromise of highly classified information. Yet, he received no compensation or recognition for his work.

**46.** In 2005, Plaintiff found an employment announcement on www.intelligencecareers.com (see **Exhibit 3**), in which the successful applicant for this position would be required to reinvent Plaintiff's devices. The job was at the **General Dynamics** facility in Scottsdale, Arizona. Plaintiff wrote to the president of that organization informing him of the existence of his intellectual property (device designs). After several attempts to capture the attention of this person, his secretary sent Plaintiff an email informing him of a total lack of interest in this opportunity on the part of **General Dynamics.**

**47.** At the very least, Plaintiff is due the Lehman fee for a notional contract for the development of his devices. The estimated value of the notional contract will assumed to be one million dollars ($1M), which leads to a fee of $50,000. Clearly, this is less than the $100,000 referenced above, but Plaintiff seeks to maintain a consistent approach for computing each specific claim herein.

**Compensation Claim: $50,000**

**48.** 3. **Developed Multispectral/Hyperspectral Imagery Applications Program**

In September 1977, Plaintiff moved his employment to then-TRW Systems, now a part of **Northrop Grumman Corporation.** As part of this new position, Plaintiff was required to learn the discipline of imagery intelligence. In the process of doing so, Plaintiff discovered the field of multispectral imagery, and its principal collection platform, LANDSAT. Plaintiff began to search for national security programs that utilized multispectral imagery. He found a minor tactical application, but to his amazement, there wasn't any program in any security system that was working on the strategic applications of this then-relatively new technology.

**49.** Plaintiff began his quest to introduce the strategic applications of multispectral imagery technology by writing a white paper, in October 1978, which he then sent to two officers at

Strategic Air Command headquarters. One of these officers, **Lt. Colonel R. L. (Rob) Hoover** of Strategic Air Command's Intelligence organization, took Plaintiff's white paper to Washington, and for a week he went around to all of the appropriate intelligence community offices, told people what Plaintiff was proposing, and asked what they thought.

**50.** Without telling Plaintiff what was said by anyone, Colonel Hoover simply requested a briefing on this subject as soon as possible. Plaintiff complied by presenting two briefings to a high-level audience on 26 January 1979. As a result, Strategic Air Command asked the Plaintiff to accept a contract to assist it and the Joint Strategic Target Planning Staff (JSTPS) in utilizing multispectral imagery to enhance their mission performance.

**51.** Plaintiff moved from **Northrop Grumman Corporation** to the **Science Applications, Inc** with the goal of pursuing this opportunity. Plaintiff changed employers because **Northrop Grumman Corporation** stated emphatically that it had no interest in pursuing this new business opportunity, while **Science Applications, Inc** said that it would permit Plaintiff to pursue said contract.

**52. Science Applications, Inc** then reneged on its promise to allow Plaintiff to pursue the multispectral imagery contract with the Strategic Air Command. The Strategic Air Command then decided to do this work itself in-house by establishing the SAC LANDSAT Application Program (SLAP). **Science Applications, Inc** feared that the money for the multispectral imagery contract would come from the budget that funded **Science Applications, Inc.'s** weapons effects contracts, and thus tried to kill the multispectral imagery effort at the Strategic Air Command. Plaintiff was clearly hired by **Science Applications, Inc** under false pretenses.

**53.** Multispectral imagery has evolved into hyperspectral imagery, which has resulted in the establishment of an entirely new segment of the defense business with numerous companies

realizing corporate revenues from Plaintiff's original work, for which he has never earned any compensation whatsoever. Also, at least a portion of his work was used to establish yet another segment of the National Security Establishment with the advent of measurement and signature intelligence (MASINT).

**54.** The Plaintiff's expenditures for the briefings, books, travel, etc. associated with his original work cost him thousands of dollars for which, to reiterate, he has never realized any return. Plaintiff made these expenditures under the assumption that they were **investments** in his career, for which he would realize a healthy return, given the impact of his intellectual property on national security.

**55.** Instead, these expenditures turned out to be **costs,** due to his negative return on investment. To be abundantly clear, Plaintiff did not "invent" multispectral imagery, nor was he the first to consider this technology for national security applications. But Plaintiff was the first to establish a coherent examination of how multispectral imagery could enhance United States National Security; the first to identify specific applications/targets of multispectral imagery to enhance national security; and the first to develop a coherent and robust plan for exploiting multispectral imagery for national security applications. As result of these contributions, Plaintiff is told that within the U.S. intelligence community, he is considered the originator of what we have today in this arena. There are numerous programs in the intelligence community/Department of Defense devoted to multispectral/hyperspectral imagery. Clearly, Plaintiff's original contributions to this arena have paid large dividends to both the U.S. Government and its contractor community. Plaintiff, as the originator of all of this, has received nothing. Since Plaintiff's original intellectual property spawned the national security applications of multispectral/hyperspectral imagery, as well as a new segment of the defense industry, it is clear that his intellectual property

is still in use. Therefore, the statute of limitations has not expired, thus making the Plaintiff eligible for compensation, however belated.

**56.** By the summer of 1980, **Science Applications, Inc** had reneged on its promises to Plaintiff regarding the multispectral imagery opportunity. During that summer, Plaintiff gave several presentations at Strategic Air Command Headquarters on space force structure planning. Given that **Science Applications, Inc** had reneged on its promises, and given that the Strategic Air Command determined its need for Plaintiff's skills in both areas, it decided to ask Plaintiff to form his own company for the purposes of doing all of the planning and analysis to determine its roles and missions in space.

**57.** But shortly after Plaintiff had left **Science Applications, Inc** to conform with the opportunities presented by the Strategic Air Command, there occurred a terrible case of espionage at the Strategic Air Command headquarters that has never been made public. As a result, then-Secretary of Defense Harold Brown issued an order that forbid the Strategic Air Command from contracting directly with private contractors. The Strategic Air Command therefore attempted to get funding for Plaintiff from other parts of the National Security Establishment. The letter from the Strategic Air Command's Vice Commander-in-Chief, **Lt. General George D. Miller,** to his counterpart at Air Force System Command, **Lt. General Robert M. Bond,** is presented as **Exhibit 4**. General Bond not only declined to fund Plaintiff's project, but he wanted all of Plaintiff's intellectual property to date for free. While General Bond's lack of professionalism clearly demonstrates the intra-service rivalry that existed between the Strategic Air Command and Air Force Systems Command (AFSC), Plaintiff should not be expected to suffer the adverse monetary consequences of this situation.

**58.** At the very least, Plaintiff is due the fee established by the Lehman formula for finding capital for new business. Assuming that the total expenditures to date have been two billion dollars ($2B) for hardware and software, imagery analysis and exploitation, etc. leads to the value of the Plaintiff's claim. This claim is based upon the programs known to the Plaintiff, many of which are identified in the book **Code Names** by William M. Arkin, as well as the job openings that have been listed over the past decade on the web site www.intelligencecareers.com.

**59.** This estimate is considered to be quite conservative, and it is likely that a procurement professional that specializes in the financial aspects of national security systems would compute a higher value. Such a description may require the disclosure of highly classified material, but if anyone with standing wishes for this to be done, it's likely that appropriate accommodations could be realized.

**Compensation Claim: $20,000,000**

**60.** **4. Provided foundation for the Military LANDSAT Space System (includes ground station).**

Obviously, in order to develop and exploit for national security purposes, multispectral and hyperspectral imagery has to be collected. In **Exhibit 5,** some of the space hardware that has been used to accomplish this mission is listed. Plaintiff has been told of a large classified space program dedicated to the collection of this type of imagery. Plaintiff has two sources for this information, one of whom is a retired Air Force colonel as well as a Central Intelligence Agency retiree, **Marvin Richman**. His meeting with Mr. Richman was on the Friday afternoon before Memorial Day in 1984, at which time he told Plaintiff that he had just been to a meeting of the Air Force Scientific Advisory Board. Mr. Richman had seen Plaintiff's original briefing

presented at that meeting, and that it had numerous security classification stamps on it, once again proving that Plaintiff was the originator of this program. However, this program may have been consolidated into LANDSAT 7, which the Department of Defense co-sponsored with NASA. Should this be the case, it would reduce Plaintiff's fee by an amount to be determined.

**61.** When Plaintiff gave his original briefing at Strategic Air Command headquarters in 1979, he overheard one Air Force officer tell another one that the intelligence community did not know what to do with an infrared imagery collection payload that was already on orbit. This assists in validating the fact that Plaintiff was in fact the first to understand the national security applications of multispectral imagery.

**62.** At the very least, Plaintiff is due the fee established by the Lehman formula for the identification of capital for new business. Many of the companies knew of Plaintiff's role in establishing the robust business segment of the defense industry tied to multispectral/hyperspectral imagery, and simple blew him off when he sought consulting opportunities. Thus, the United States Government, having certified these companies as competent, ethical, etc. to help provide for the common defense, is ultimately responsible for their behavior. Therefore, the Government is liable for the Plaintiff's just compensation. Again, based upon an analysis by both the Plaintiff and a retired chief engineer at one of the country's large space system providers, a conservative estimate of the expenditures for spacebased hardware, as well as ground station hardware and software is two billion dollars ($2B), which leads to the value of the Plaintiff's compensation claim.

**63.** This estimate is considered to be quite conservative, and it is likely that a procurement professional that specializes in the financial aspects of national security systems would compute

a higher value. Such a description may require the disclosure of highly classified material, but if anyone with standing wishes for this to be done, it's likely that appropriate accommodations could be realized.

**Compensation Claim: $20,000,000**

**64.  5. Developed the Satellite Communication Relay concept, which became the M-22 Tactical Network.**

In 1976, while working on a study for an advanced reconnaissance satellite at **The Boeing Company**, Plaintiff developed a satellite self-relay concept to support tactical users of collected intelligence in near real time. Without discussing it with the Plaintiff, personnel of **The Boeing Company** took Plaintiff's concept (originally called "The Keehn Concept"), which required a comprehensive knowledge of tactical command, control and communication (C3) systems, and began to brief it around the intelligence community. Knowledge of tactical C3 systems is very rare among engineers in the defense industry, thus this knowledge base was a part of Plaintiff's unique skill set.

**65.** As a result, The Keehn Concept was funded, it was designated the M-22 Tactical Network (MTN), and it is reportedly still in use. Plaintiff never received any compensation, other than his meager paycheck, for his efforts that led to the MTN. Had he been a uniformed officer of the United States Armed Forces, he would very likely have received career recognition, awards and an early promotion.

**66.** This would have occurred as a result of the fact that the intelligence community at that very time was considering deploying a three-satellite system that became unnecessary as a result of The Keehn Concept, thus saving the taxpayers billions of dollars over several decades.

**67.** At the very least, Plaintiff is due the fee established by the Lehman formula for the identification of capital for new business, and for the just-mentioned savings for taxpayers. This leads to the total value of Plaintiff's compensation claim.

**Compensation Claim: $20,000,000**

**68.** 6. **Developed system and operational concepts for utilization of the STS for Crisis Reconnaissance.**

In 1977, President Carter was on the verge of canceling the Space Transportation System, more commonly know as the Space Shuttle (hereinafter Shuttle). As a result, a retired **Air Force colonel, Dr. Gordon Orm**, whom Plaintiff had met on his first day of employment at **Northrop Grumman Corporation**, came to the Plaintiff searching for additional missions for the Shuttle that might keep it from being canceled. Plaintiff, having just completed the Crisis Management course in his self-designed doctoral program, suggested that the Shuttle could be used for crisis reconnaissance for areas of the global where coverage by the on-orbit reconnaissance satellites was insufficient for the requirements of the National Command Authority (NCA).

**69.** Dr. Orm liked the idea, and he immediately wrote a proposal, which was then funded by **Dr. James Babcock,** then-Deputy Assistant Secretary of Defense for Intelligence. Plaintiff managed this study until his departure for **Science Applications, Inc**. But by that time, the management of **Northrop Grumman Corporation**, having told Dr. Babcock and his people that they did not know what they were doing, resulted in a cancellation of the program. The program was funded yet again, this time to **Science Applications, Inc**, where Plaintiff worked on it again. **Science**

**Applications, Inc** was teamed with **Rockwell International,** now a part of **The Boeing Company.**

**70.** The program evolved into a series of payloads that could be deployed on the Shuttle for use in crisis reconnaissance. Again working with the retired chief engineer referenced above, a value of $2.5B was computed as the total value of the payloads to be utilized in this program. (**See Exhibit 6)**

**71.** At the very least, Plaintiff is due the fee established by the Lehman formula for the identification of capital for new business, and for the just-mentioned savings for taxpayers. This leads to the total value of Plaintiff's compensation claim.

**Compensation Claim: $25,000,000**

//

## DESCRIPTION OF TASKS COMPLETED RELATED TO NATIONAL POLICY AND GUIDANCE DEVELOPMENT

**72** 7. **Identified ten missions for spent upper stages (e.g. the Inertial Upper Stage [IUS]) for operational support to strategic forces.**

In this task, which began in 1981, Plaintiff developed ten potential missions for spent upper stages, which boost satellites from low earth orbit into geostationary orbit, and then were intended to become $100 million pieces of space junk in the case of the IUS These vehicles are also known as orbital transfer vehicles (OTVs). Plaintiff was the first to attempt to convert these vehicles into usable satellites in their own right. At the time that Plaintiff commenced this task, it was considered so far out of the mainstream of thinking about the future of space as a critical national security arena that no one in Government had any idea what to do with the concept. At the request of senior leadership

of the Air Force, Plaintiff briefed **Dr. Hans Mark**, then NASA Administrator and former Secretary of the Air Force, to get his input. On November 18, 1981, Plaintiff went to the White House to brief **Dr. Victor H. Reis**, then-Assistant Director of the Office of Science and Technology Policy in the Executive Office of the President. While Plaintiff did not receive a contract to further develop the concept of utilizing OTVs, he started a process that led to their use, for which he spent many thousands of dollars of his own funds, and for which he never received any monetary compensation whatsoever. The fact that these vehicles became a part of the national security space force structure makes his work relevant to this day, and thus subject to compensation.

**73.** This technological innovation purportedly became a highly classified program when it was illegally misappropriated by a retiring Air Force general who didn't understand military operations. Thus, that particular program was cancelled after two years. Plaintiff has three sources who have independently verified this allegation, and he will seek sworn affidavits from these gentlemen if the Court and/or defendant should desire them.

**74.** Plaintiff did extensive research and analysis to support his comprehensive briefing on his proposal; he traveled to Washington to brief senior members of the Department of the Air Force, and White House. (See **Exhibit 7).** Plaintiff spent approximately two man-years on this task.

**75.** At the very least, Plaintiff is due the value of the opportunity costs plus his accounting costs associated with the generation of his intellectual capital development plus intellectual property in this significant contribution to the security of the United States.

**Compensation claimed: $1,080,000**

**76. 8. Developed a series of electronic warfare methods against adversary satellites to enhance strategic operations.**

This task was commenced in 1980 while the Plaintiff was employed by **Science Applications, Inc**. The objective was to provide the developers of strategic operations plans and concepts an understanding of the utility of so-called "soft" kill options that could be provided by utilizing electronic warfare techniques against adversary space systems, and to provide a first-cut doctrine for its employment..

**77.** When it became clear that this task was not going to get funded without doing some work on it first, **Science Applications, Inc** lost all interest in this project, and terminated Plaintiff's employment. At this point, the former Strategic Air Command told Plaintiff that if he were to form his own company, it would provide him contracts to do all of the initial planning and analysis for Strategic Air Command roles and missions in space. Plaintiff formed **Strategic Systems Sciences, Incorporated** (in 1981), a California corporation, which he then abandoned in 1990.

**78.** The electronic warfare project was just one of the tasks undertaken by the Plaintiff in the arena of Strategic Air Command roles and missions in space. Plaintiff traveled to Strategic Air Command Headquarters in October 1981 to brief numerous members of the Headquarters staff, including **Colonel Ed Mishu**, who was director of electronic warfare systems and operations for the Strategic Air Command. He stated that Plaintiff's briefing on the utilization of electronic warfare against Soviet satellites to enhance Strategic Air Command operations was "the best that I have heard on this subject." He then sent twixs to all relevant funding sources in an attempt to get Plaintiff's task funded. **Colonel Robert Seh**, (previously at Strategic Air Command headquarters) senior member of the

Office of the Joint Chiefs of Staff, tried valiantly to get funding for the project, but was not successful.

**79.** However, in 1987, Plaintiff found that his work had been funded to another company. An Air Force lieutenant colonel informed Plaintiff that the Air Force simply did not award contracts to companies that did not employ retired colonels or higher ranked retired officers, and that this is why the funding sources within the Air Force that possessed the ability to award contracts would not fund Plaintiff's **Strategic Systems Sciences**, no matter how much the combatant commands desired that they do so. As a result, Plaintiff provided the guidance for this program, but the funding went to those who had retired colonels on staff. But since Plaintiff original work is still in use, it is subject to compensation.

**80.** At the very least, Plaintiff is due the value of the opportunity costs associated with this task, which include the value of time spent learning the issues in his self-designed doctoral program. He is also due all accounting costs, including those associated with this task, plus an amortized portion of the just-mentioned doctoral program.

**Compensation claimed: $432,000**

**81.** 9. **Developed utilization concept for retired boosters (e.g., the THOR) to enhance United States strategic operations.**

In 1983, a vice president of what was then the Martin Marietta Corporation told the Plaintiff that the United States Air Force had nine retired THOR intermediate range ballistic missiles (IRBMs) left in its inventory. He said that if a mission for these birds could not be found fairly quickly, they were going to be given to various museums throughout the country. Since he thought that

there surely must be a better utilization for these missiles, he asked the Plaintiff to find such a mission(s).

**82.** After much thought and study, Plaintiff noted that the flight characteristics of the THOR were almost identical to the SSN-6 Soviet submarine-launched ballistic missile (SLBM). This SLBM was at the time the principal threat to the Strategic Air Command's bomber force vis-à-vis a surprise attack.  Without going into greater detail, suffice it to say that Plaintiff wrote a white paper that proposed the use of the THOR to kick-off Strategic Air Command's annual major exercise. Plaintiff submitted his white paper to both the Headquarters of the Strategic Air Command and to the Air Force System Command's Space Division. **Colonel Victor Whitehead,** Director of Launch Vehicles at Space Division was favorably disposed to the Plaintiff's concept to the point that he canceled the transfer of the remaining THOR missiles to museums. While Plaintiff's proposal was never adapted out of fear within the Air Force that such a test would uncover flaws in various tactical warning systems, Plaintiff's intellectual property was nonetheless the type of intellectual property that the Defense Department contracts for with so-called "think tanks."

**83.** Thus, as presented in **Exhibit 8,** Plaintiff's intellectual property contributed to the thinking of Strategic Air Command's most senior leadership. Since Strategic Air Command's corporate knowledge base was thus expanded, and that knowledge base is still in residence at United States Strategic Command, it is subject to compensation, however belated.

**84.** At the very least, compensation for this task should be the total of Plaintiff's accounting costs associated with the generation of his intellectual property, plus the value of his opportunity costs associated with this task.

**Compensation Claim: $72,000**

**85.** 10. **Identified ten satellite relay services in support of Department of Defense roles and missions.**

In the 1984-85 timeframe, Plaintiff developed ten satellite relay concepts to reduce costs of national defense. As one example, Plaintiff proposed that instead of deploying more than 20 signals intelligence specialists in the cabin of airborne collection platforms, these military personnel be put in a satellite ground station in the United States. "The take" from the airborne collection platform would then be backhauled through a communication satellite to this ground station. One such platform is the Navy's EP-3, one of which was shot down and forced to land in China in 2001

**86.** This approach to signals intelligence collection would preclude the deployment of the aforereferenced specialists from having to be stationed overseas, it would also permit the reduction in the number of crews, and a host of additional savings. When Plaintiff contacted the **Naval Security Group** headquarters with this concept of operation, he was told that the concept may not be as good as sliced bread, but it was close. In other words, they liked the concept; the **Air Force was equally enthusiastic.** Other parts of the DoD also endorsed this concept, but by this time Plaintiff had run out of money, and had gone to work for what is now **Northrop Grumman Corporation**, and they killed it in a manner that would require too much of this Court's valuable time to explain. However, by having a defense contractor that does not have the best interests of the United States' security as its goal when making business decisions, is the fault of the Government, not the Plaintiff's.

**87.** The Government is therefore liable for the Plaintiff's costs in the pursuit of not only this satellite relay concept, but also nine others of equally potential payoff in cost savings afforded by new operational concepts for critical missions. Plaintiff's basis of estimate for his claim here is

the time that he spent developing these potential relay missions as well as the time spent learning military strategy, doctrine and operations. He is also concerned that **Northrop Grumman Corporation's** behavior not only cost the taxpayers a lot of savings on critical missions, but also damaged his career. However, it should be noted that a senior manager at **Northrop Grumman Corporation** did in fact pursue some of these relay missions without a full comprehension of the missions. He therefore failed in his attempt to establish what **Dr. J. Robert Burnett,** deputy Space and Defense Sector executive officer at **Northrop Grumman Corporation,** concluded would have been an entirely new line of business for the company. The Department of Defense is believed to be suffering to this day due to the lack of these relay missions. The shoot-down of the Navy's EP-3 in 2001 is a prime example.

**88.** At the very least, compensation for this task should be the total of Plaintiff's accounting costs associated with the development and production of briefing materials, etc. plus the value of his opportunity costs.

**Compensation Claim: $432,000**

**89.** 11. **Developed roles and missions for Strategic Air Command's Space Master Plan**

Plaintiff was convinced that Strategic Air Command would eventually find a funding source, so he kept working on the tasks that he expected to perform under contract, and he eventually developed a detailed methodology, shown in **Exhibit 9,** and provided it to the Strategic Air Command for free. Plaintiff presented his methodology to the appropriate the Strategic Air Command officers, who approved Plaintiff approach to the task at hand.

**90.** The fact that the fine people at the Strategic Air Command accidentally defrauded him by being unable to persuade any funding sources within the Government to provide the Plaintiff funding for the agreed upon task should not relegate Plaintiff's time as unworthy of

compensation. Therefore, his generated intellectual property should serve as a basis for compensation for a portion of the goods and services that he generated.

**91.** Plaintiff rose each morning at 6:30 for nearly a year, and wrote for most of the day. He generated a detailed assessment of the Strategic Air Command's roles and missions in space. Plaintiff is still in possession of this material.

**92.** At the very least, Plaintiff is due the value of the opportunity costs for the year that he spent generating the roles and missions material, as well as a pro-rated amount of his self-designed doctoral program. Plaintiff should also be reimbursed for all of his accounting costs for his travel to Strategic Air Command headquarters near Omaha in which the particulars of the task were negotiated with senior Strategic Air Command officers.

**Compensation Claim: $1,440,000**

**93.** 12. **Provided United States Space Command with an approach to military space strategy, which was then implemented.**

In 1985, Plaintiff served on a defense industry-wide panel whose charter it was to develop options for establishing a national military space strategy that could be implemented by the Air Force Space Command. Plaintiff does not seek full compensation for this effort, as he agreed to participate in the work of this panel as a part of his duties at **Northrop Grumman Corporation**.

**94.** In November 1985, after six months of work by the panel, which was chaired by Air Force Reserve **Major General Frank D. Watson**, it decided to recommend to the Air Force Plaintiff's approach to the development of military space strategy. It is described herein so that the Court will better understand tasks presented below for which compensation is sought. However, let it be known that Plaintiff did most of this task on his own time, and did not receive any recognition for his efforts, either from the Air Force or **Northrop Grumman Corporation**. After an 18-

month review process, the United States Space Command, the parent organization of Air Force Space Command, decided to implement Plaintiff's recommendations for the development of a national military space strategy. A detailed presentation of the strategy can be provided upon request.

95. Plaintiff's accomplishment provided **Northrop Grumman Corporation** the opportunity to improve its offerings to the Department of Defense by manifesting its understanding of the military strategy and doctrine used to support the systems that it built, and it failed to do so. This not only cost the taxpayers money, but also the Plaintiff, because he did not realize any reward from his contribution to United States national security.

96. **Northrop Grumman Corporation** also had this opportunity to take credit for Plaintiff's contribution to national policy and guidance, but it did not do so. This was due to it not understand anything about how the National Security Establishment functions, and therefore it had no knowledge as to the significance of Plaintiff's intellectual property. The fact that **Northrop Grumman Corporation** demonstrated its lack of interest in United States security should not accrue to the detriment of the Plaintiff when he made a serious contribution to the missions of the United States' Armed Forces.

97. As an example, in 1987, **Northrop Grumman Corporation** hosted a national meeting of the Satellite Assembly, Maintenance and Servicing community. The symposium began with a briefing by an Air Force colonel who had come out to **Northrop Grumman Corporation** in Redondo Beach, California from Washington. He began his briefing by presenting the national military space strategy that originated with Plaintiff's strategy from his 1985 proposal to Air Force Space Command. Rather than point this out to this industry-wide audience, **Northrop Grumman Corporation** management simply sat there, and said nothing because they lacked an

understanding of the role of military strategy in the procurement process. Also, as a general rule, they did not recognize anything for which they could not take personal credit.

**98.** The ultimate responsibility for these failures is the Department of Defense (hereinafter DoD). It is the DoD that certifies contractors as competent and ethical to assist in providing for the common defense. So when a defense contractor directs one of its employees to perform a particular task in this regard, in this case the Plaintiff, and then does not recognize, reward, or exploit in a positive sense the accomplishments of said employee, the DoD is responsible for such dereliction.

**99.** The DoD implicitly acknowledged this responsibility in the late 1980s when it assisted **Northrop Grumman Corporation** in establishing the GainSharing bonus program in which the DoD funded the rewarding of outstanding performance by **Northrop Grumman Corporation** employees. The DoD did this because it told **Northrop Grumman Corporation** that it did not treat its high-performance employees well. Therefore, Plaintiff seeks compensation based upon the time and effort that he spent in generating his proposed military space strategy, for which he was never compensated.

**100.** Specifically, Plaintiff's compensation should be based upon the value of his opportunity costs, plus the accounting costs, which include an amortized portion of his self-designed doctoral program, from which he developed the relevant intellectual capital. Plaintiff employed this intellectual capital in the development of the military space strategy implemented by United States Space Command. It is the opportunity costs and the accounting costs associated with this aspect of his contribution for which he seeks compensation.

**Compensation Claim: $576,000**

**101.** 13. **Developed a series of space force structure planning databases.**

In 1987, as a part of an internal project at **Northrop Grumman Corporation**, Plaintiff developed a series of space force structure planning databases to be used as planning tools for a host of lines of business at **Northrop Grumman Corporation**. While reformatted at **Northrop Grumman Corporation's** very minimal expense, Plaintiff had developed the content of these databases while he owned **Strategic Systems Sciences**, **Incorporated**. This was a part of Plaintiff 's effort to establish the Strategic Air Command's roles and missions in space. Once this was accomplished, it was not difficult for the Plaintiff to extend this effort to the other Armed Services, particularly after the intellectual property that he generated during the aforementioned task on developing military space strategy. But when the United States Space Command heard about these databases, they asked to see them. Plaintiff proceeded to the headquarters of United States Space Command in Colorado Springs with a presentation with **Northrop Grumman Corporation's** support and approval. To summarize the results, **Vice Admiral William E. Ramsey**, then-Deputy Commander-in-Chief of United States Space Command had been asking his staff for just these types of databases, and one in particular. See **Exhibit 10.**

**102.** Admiral Ramsey requested Plaintiff's assistance in writing an operational plan (OPLAN) for each theater commander worldwide. Plaintiff also had the support of several other admirals and generals who saw his databases, including Navy **Rear Admiral Jerry Breast, Rear Admiral Richard C. Macke, Army Brigadier General Robert E. Hughes, and other flag rank officers.** But, **Northrop Grumman Corporation** refused to allow Plaintiff to accept the Admiral's offer. However, Plaintiff once again demonstrated that he understood how to utilize space for national security purposes, and had he been permitted to accept the contract offered by Admiral Ramsey, Plaintiff's career would have been dramatically enhanced.

**103.** In this same timeframe, Admiral Macke, who was then Commander of the **Naval Space Command**, requested that the Plaintiff travel to his headquarters in Dahlgren, Virginia to assist him in updating the Naval Space Command Master Plan. The management of **Northrop Grumman Corporation** refused the admiral's request. Given that **Admiral Macke became Commander-in-Chief of Pacific Command, the second highest-ranking officer in the Navy,** just a few years later, there is a strong likelihood that Plaintiff career would have been dramatically enhanced if he had been permitted to accept this opportunity, to say nothing about his potential contribution to the Navy.

**104.** Once again we have an instance in which a defense contractor was not interested in what was best for the country or the career of one of its employees, in this case the Plaintiff. But while the country continues to survive, this instance, as well as several others, did irreparable damage to Plaintiff's career, and the Government knew it. Therefore, the Government is liable for **Northrop Grumman Corporation's** malfeasance since it did in fact benefit to some degree from plaintiff's effort. A part of the principal database was given to United States Space Command, and it therefore knew how to regenerate Plaintiff's databases.

**105.** Plaintiff allowed **Northrop Grumman Corporation** to take credit for intellectual property that he had produced while sole proprietor of **Strategic Systems Sciences**, and they destroyed this opportunity both for itself and the Plaintiff. Because the Government knew about this situation, but refused to attempt to rectify it, it is liable for the losses the Plaintiff suffered by not being able to benefit from both his own intellectual property and intellectual capital. At the very least, the computed liability includes amortization of the accounting cost of more than 1100 references used in generating the databases, plus the value of the opportunity cost associated with the time that the Plaintiff spent generating the databases. Admiral Ramsey's staff estimated that it

would require 18 man-months to regenerate these databases, so this will serve as Plaintiff basis of estimate of the value of the opportunity cost for his compensation claim.

**Compensation Claim: $2,160,000**

**106.** 14. **Provided support to the Central Intelligence Agency's Office of Strategic Research (hereinafter OSR) and the President's National Security Advisor on the generation of the first National Intelligence Estimate (hereinafter NIE) on the Soviet space force structure.** In the late 1970s, when the Plaintiff was working on his self-designed doctoral program in force structure planning, he studied both arms control and the Soviet space force structure. This led to the Plaintiff developing an analytical assessment of the strategic center of gravity of the Soviet space force structure. As a result, a senior manager at **Northrop Grumman Corporation** asked Plaintiff to assist then-retired **Major General David D. Bradburn,** who was the representative of the Joint Chiefs of Staff to the Helsinki negotiations with the Soviets on space arms control.

**107.** When the **Central Intelligence Agency 's Office of Strategic Research** heard about Plaintiff's intellectual property, it requested the opportunity to review it. After this review, the **Central Intelligence Agency** told Plaintiff that President Carter's National Security Advisor **Zbigniew Brzezinski** had requested that the **Central Intelligence Agency** produce the first National Intelligence Estimate on the Soviet space force structure. The **Central Intelligence Agency** requested that **Northrop Grumman Corporation** permit Plaintiff to go to **Central Intelligence Agency** headquarters in Langley, Virginia to assist it in its preparation of the aforementioned NIE.

**108. Northrop Grumman Corporation** emphatically refused to yield to the **Central Intelligence Agency's** request with the assertion that it did not understand Plaintiff's analysis. But the reality is that no one in Plaintiff's management at **Northrop Grumman Corporation**

even tried to understand his intellectual property. But others in management understood it very well. The **Central Intelligence Agency** personnel working on the NIE (Plaintiff does not want to use the names of these people although he remembers them well) asked their management to intercede with **Northrop Grumman Corporation** management to attempt to get Plaintiff to **Central Intelligence Agency** headquarters to work on the NIE. **Central Intelligence Agency** management refused, stating that for its request to be denied by **Northrop Grumman Corporation** was an indication to them that "something's going on there of which we are unaware, and we need to stay out of it." While a perfectly common path of least resistance, Plaintiff asserts that it was the **Central Intelligence Agency's** duty to find out what was going, if it truly believed that Plaintiff's services were required in order to provide Dr. Brzezinski the best product possible.

**109.** To make a long story succinct, Plaintiff and the **Central Intelligence Agency** found a way to get together, and Plaintiff did in fact assist in the preparation of the NIE. In fact, the **Central Intelligence Agency** sent Plaintiff a draft copy of its NIE for review, thus verifying the significance of Plaintiff support. Plaintiff is informed that for the **Central Intelligence Agency** to request assistance from someone who was not a **Central Intelligence Agency** employee in the production of an NIE was extraordinarily unusual.

**110.** In 1988, United States Space Command requested that Plaintiff be permitted to travel to Geneva ASAP to assist the United States negotiators for the Geneva negotiations on space arms control. The Soviet delegation informed the United States negotiators of its desire to use the Clausewitizian concept of the strategic center of gravity as a means of establishing a negotiating framework. The United States team had no idea what the Soviets were talking about. But then-Air Force **Colonel Richard Szafranski,** Director of the Commander-in-Chief's Study Group at

United States Space Command, knew that Plaintiff had also developed this approach as a negotiating framework, and thus, through him, Space Command made its request.

**111.** Again, the management of **Northrop Grumman Corporation** denied the Government's request. As a result in both of these tasks, the Government's efforts to reach an arms control accord with the Soviets were impended, as was the opportunity for Plaintiff to enhance his career in potentially dramatic fashion. Since the Government allowed **Northrop Grumman Corporation's** decisions to stand, it is liable for impeding the Plaintiff's career. Plaintiff thus seeks compensation for both the development costs of his unique intellectual capital, and the loss of the opportunity to employ this intellectual capital in a manner that would have benefited both the United States as well as the Plaintiff's career. [**Plaintiff is informed and therefore believes that the most likely reason that all of the Government's requests for his assistance presented herein were denied by Northrop Grumman Corporation so as to not to disrupt the use of his name in the Central Intelligence Agency's Evil Twin program. See Exhibit 20.3. On five occasions between 1978 and 1988, the United States Government requested Plaintiff's assistance in developing solutions to high-value national security problems, and in all five instances Northrop Grumman Corporation told the Government that it would not honor its request. This raises grave questions on a number of levels.**]

**112.** Plaintiff's basis of estimate of his accounting costs for this specific compensation claim is based upon the amortized time and costs of his self-designed doctoral program, from which the just-mentioned intellectual capital was developed, plus the value of his opportunity costs for being denied the aforereferenced opportunities.

**Compensation Claim: $144,000**

**113.**  15. **Briefed the Strategic Air Command's Program Evaluation Group on Space as a Critical Strategic Arena.**

The former Strategic Air Command had a Program Evaluation Group (hereinafter PEG) of 20 senior colonels, and chaired by a one-star general (**Brigadier General Stanford E. Brown** at the time) whose function was to establish Strategic Air Command's priorities for all 264 items in the Air Force budget. This was in 1981. Many of these budget items related to national security space systems for which the Strategic Air Command as a whole had little experience. As a result, senior leaders at the Strategic Air Command Headquarters, in particular **Brigadier General William L. Shields**, requested that Plaintiff create a briefing to assist members of the PEG in setting Strategic Air Command's priorities for these space systems in the Air Force budgeting process. The briefing's title is **Space as a Critical Strategic Arena.**

**114.** Plaintiff did as requested with the sense that it might expedite the funding of his efforts in developing Strategic Air Command's roles and missions in space. Plaintiff's briefing accomplished its goals, as set forth in **Exhibit 11.** Many people in the defense industry would have loved to brief the PEG as a means of influencing the Strategic Air Command's priorities, and thus their own programs. However, Plaintiff was informed at the time of his briefing that he might have been the only one from the defense industry to ever be invited to brief the PEG. Plaintiff again spent his own time and money (getting the briefing typed, travel to Omaha, etc.), and never received any monetary compensation for this task.

**115.** Plaintiff paid all expenses for the development and production of the briefing out of his own funds, and he is due, at the very least, the accounting costs associated with the time and effort required to developed his intellectual capital that, in turn, was used to develop this briefing. Additionally, Plaintiff's the expenses that he incurred in his travels associated with the

presentation of this briefing are also a part of his accounting costs. Plaintiff also seeks the value of the opportunity costs associated with this task.

**Compensation Claim: $432,000**

**116.** 16. Using a minor variation of the abovementioned briefing (**Space as a Critical Strategic Arena**), **Dr. William Perry**, then an assistant secretary of defense in the Carter administration, briefed then-**President-elect Ronald Reagan** as a part of President-elect Reagan's transition process. Plaintiff was not told about this until the colonel who provided the briefing for Dr. Perry called Plaintiff, and told him that he had made a few minor changes to Plaintiff's briefing, and then gave it to Dr. Perry for presentation to President-elect Reagan and his defense transition team. As a result of this and other goods and services that the Plaintiff provided to the Government, he was asked to become Director of Space Policy in the Office of the Secretary of Defense for the incoming Reagan administration. Plaintiff declined this opportunity for reasons not relevant herein.

**117.** But Plaintiff saved the Government time and money by having written a briefing that was of sufficient quality to be presented to President Reagan. Plaintiff will defer to the Court as to whether he is due any compensation in this matter other than the accounting costs described above.

**Compensation Claim: TBD**

**118.** 17. **Authored the Monograph "Strategic Utilization of Space Force Structures in a Protracted Strategic Conflict: A Net Assessment".**

In March 1980, Plaintiff authored a monograph of approximately one hundred pages in length. The actual writing of the document took less than a week, and was done while Plaintiff was an employee of **Science Applications, Inc**. The reason that Plaintiff was able to get this task done

so quickly was that he had developed most of the issues presented in the document during his aforementioned doctoral program.

**119.** This Monograph was written as part of a **Science Applications, Inc.** contract with the **Department of Defense's Office of Net Assessment**. The document went on to have wide utilization after **Science Applications, Inc**. terminated Plaintiff, and this utilization was due strictly to the efforts of the Plaintiff.

**120.** The uses of the Monograph include becoming required reading by all relevant general officers at the Headquarters of the former Strategic Air Command, including then-Commander-in-Chief, **General Richard H. Ellis. Major General John T. Randerson,** then- Strategic Air Command's Deputy Chief of Staff for Communications and Electronics, wrote a memo to his fellow general officers that this Monograph was "indispensable" in his preparations for the Pentagon meetings in December 1980 at which the MILSTAR communication satellite was born. The Monograph was required reading for all uniformed officers in the Pentagon who dealt with space issues. It also became the keynote document for the course in Space Operations at the Air Force's Air Command and Staff College. See **Exhibit 12.**

**121.** While Plaintiff gave the Government permission to use his Monograph, it was with the expectation that it would lead to funded programs in which he could flesh out the issues articulated in the Monograph. At the very least, Plaintiff is owed the value of the opportunity costs that he incurred from understanding and developing the issues, plus the accounting costs for his travel to Washington and having the revision of the monograph typed**.**

**Compensation Claimed: $720,000**

**122**. **Briefed first Air Force-wide Symposium on Space Doctrine**

In November 1985, when Plaintiff was in Colorado Springs for the Conference described in Paragraph 91, there was another event occurring simultaneously. That event was the first Air Force-wide Symposium on Space Doctrine. As a result, Plaintiff was asked to come to the Space Doctrine Symposium to explain the fundamental differences between basic doctrine and operational doctrine, because the Air Force officers from doctrine development organizations from throughout the Air Force could not agree on the fundamental concept of what constituted doctrine.

**123.** After Plaintiff's impromptu lecture, **Colonel Dennis Drew from the Air War College** stated that he then understood what changes he must make to the curriculum at the Air Force's Air Command and Staff College and the Air War College. Plaintiff was asked to reduce his input to a formal set of charts, which he did, and delivered them to the Air Force in December of that year. It is fact disturbing that a civilian had to explain to the Air Force's own doctrine experts the fundamentals of doctrine. But it again illustrates the depth of work that Plaintiff had done learning all aspects of the military profession so as to enhance his expertise in space force structure planning. In turn, this intellectual capital benefited both industry and Government alike. In terms of monetary rewards, it never benefited the Plaintiff.

**124.** At the very least, Plaintiff is due the value of the opportunity costs associated with the time spent developing his intellectual capital that he demonstrated at the Space Doctrine Symposium, as shown in **Exhibit 13.**

**Compensation Claimed: $144,000**

**125.** 19. **Developed the concept of "traceability architecture" to generate methods for evaluating and selecting reconnaissance and surveillance systems for a particular mission or set of missions.**

In 1978, while employed by **Northrop Grumman Corporation,** Plaintiff developed a methodology for selecting reconnaissance and surveillance systems as a function of a specific set of military missions. Known as "traceability architecture", the briefing that described Plaintiff's methodology was co-authored with another **Northrop Grumman Corporation** employee became know as **the bible** among those in the intelligence community who were responsible for selecting the most optimal reconnaissance or surveillance system vis-à-vis the satisfaction of mission requirements. Plaintiff solely developed the traceability architecture portion of the briefing.

**126.** At the very least, Plaintiff is due the value of the opportunity costs associated with his acquisition of the intellectual capital that he demonstrated in developing traceability architecture as well as the amortized accounting costs of his self-designed doctoral program from which his intellectual capital came.

**Compensation Claim: $576,000**

**127. 20. Supported Central Intelligence Agency /Office of Strategic Research's critique of the proposed Multiple Protective Shelter approach to the basing of the M-X missile.**

In the late 1970s and extending into the '80s, the Air Force had an exceptionally difficult time developing a basing mode for the M-X ICBM. Given Plaintiff's expertise on the Soviet space force structure described in Paragraph 104, Plaintiff was asked by the **Office of Strategic Research** at the **Central Intelligence Agency** to evaluate the Multiple Protection Shelter (hereinafter MPS) basing mode for the M-X. (Again, Plaintiff remembers the names of the people at the **Central Intelligence Agency** with whom he interfaced, but does not choose to disclose their names in this Claim). Plaintiff found serious flaws in the MPS basing mode. Once again, Plaintiff's intellectual capital, developed totally independently of any of his employers

resulted in a material benefit to the Government, and for which Plaintiff never received any compensation. Plaintiff does not have in his possession any unclassified material to support his description of this task.

**128.** At the very least, Plaintiff is due the value of the opportunity costs associated with his acquisition of the intellectual capital needed to fulfill the requirements of this task, as well as the amortized accounting costs associated with his self-designed doctoral program that led to the knowledge base used in this task.

**Compensation Claim: $144,000**

**129.** 21. **Developed the dynamic deterrence approach to the M-X basing problem.**
By 1983, the Air Force, the Congress, and the National Security Establishment in general were still wrestling with the M-X basing mode problem. On the floor of the House**, California Representative Ronald Dellums** provided a review of 30 basing options that had been considered over the years, and still he was one of many who found all of these options wanting. In this same timeframe, Plaintiff developed an approach to basing the M-X that neither the Air Force nor anyone else had considered. Plaintiff was asked by the Air Force to write a white paper describing his "dynamic deterrence" approach to the basing problem, and to get it to the Pentagon as soon as possible.

**130.** Plaintiff did as requested, and his approach was briefed to the President's Commission on Strategic Forces, commonly known as the Scowcroft Commission, which was studying the problem. The Commission was very favorable disposed concerning his basing concept, and it received about ¾ of a page in the Commission's final report, which was purportedly written by former **Central Intelligence Agency Director R. James Woolsey (Exhibit 14)**. Plaintiff also received a letter of commendation from **then-Brigadier General Gordon E. Fornell (Exhibit**

15). Note that General Fornell attempted to assist Plaintiff in acquiring a contract to study his concept further. But the Ballistic Missile Office of Air Force Systems Command was incensed that a company that did not employ retired colonels would seek a contract from it, and thus once again everyone concerned with the M-X basing problem benefited from Plaintiff's intellectual property except the Plaintiff. In 1989, a co-worker of the Plaintiff's informed him that he had read in a defense industry magazine that, had the Cold War not ended and the M-X had been deployed, Plaintiff's proposed basing mode would have been used.

**131.** At the very least, Plaintiff is due the value of the opportunity costs associated with his acquisition of the intellectual capital needed to fulfill the requirements of this task, as well as the amortized accounting costs associated with his self-designed doctoral program that led to the knowledge base used in this task. Also, the accounting costs associated with the production of the White Paper should be paid.

**Compensation Claim: $158,400**

**132.** 22. **Developed new strategic targeting doctrine, based upon "response in kind"**

In 1974, President Nixon issued National Security Decision Memorandum (hereinafter NSDM) 242: **Policy for Planning the Employment of Nuclear Weapons**. The centerpiece of NSDM 242 was the codification of the strategy of flexible strategic options, and a new targeting doctrine for United States strategic forces: response in kind. However, response in kind was never clearly defined either in this document or any of the implementing documents that followed.

**133.** In the Spring of 1977, Plaintiff audited a quarter-long Workshop in Strategic Studies at the RAND Graduate Institute for Policy Sciences in Santa Monica, California. This workshop was paid for by Plaintiff's then-employer **The Boeing Company** as a reward for all of his uncompensated overtime. It is important to note that **The Boeing Company** management clearly

stated to Plaintiff that it had no interest in using any of the knowledge base that Plaintiff acquired during the workshop.

**134.** As a part of the requirements of the course, each student was required to write a lengthy paper. In Plaintiff's 45-page paper (**Systems Requirements for Flexible Strategic Options),** he became the first to develop a formal definition of response in kind. People at RAND put his paper into The System, and in 1982, Plaintiff's targeting doctrine became national policy (see **Exhibit 16**). He was informally recognized as the author of this targeting doctrine by people at Strategic Air Command headquarters and the targeting doctrine development people within the Joint Strategic Target Planning Staff (JSTPS). During the Cold War, the JSTPS was an agency of the Organization of the Joint Chiefs of Staff, and it was co-located with Strategic Air Command headquarters, which was at Offutt AFB, Nebraska.

**135.** To reiterate, **The Boeing Company** management had no interest in developing any new business opportunities, enhancing its corporate knowledge base, or any other consideration associated with Plaintiff's aforereferenced accomplishments at RAND. Therefore, it had no claims on this intellectual property years later when it became national security policy and guidance.

**136.** Plaintiff spent years developing his intellectual capital in the areas that were required to write his paper in general, and in targeting doctrine in particular. Given that his intellectual capital resulted in a significant contribution to national security policy and guidance, he is due, at the very least, the value of the opportunity cost associated with his acquisition of this intellectual capital. If this contribution had been provided by someone in uniform, that person would have received medals, awards, and likely, an early promotion. Plaintiff received nothing except the informal "thank yous" referenced above.

**Compensation Claim: $216,000**

**137.** 23. **Developed presumptive Soviet targeting doctrine for its ASAT system.**

In 1981, Plaintiff was invited by the Air War College to present his presumptive Soviet targeting doctrine for its anti-satellite (ASAT) weapons. Plaintiff did so in February 1981 at the annual Air Power Symposium (**Exhibit 1**). Plaintiff received all of his expenses for travel, room and board, etc. plus a $100 honorarium from the Air War College, which is in Montgomery, Alabama. The following week, Plaintiff traveled to Strategic Air Command headquarters to present the same briefing to people in Strategic Air Command's intelligence organization. Once again, Plaintiff did all of this in an attempt to win one or more contracts to continue his work in this area.

**138.** While the Strategic Air Command in fact wanted Plaintiff to receive contract(s), once again none of the Air force's funding sources would comply. Therefore, the Air Force is responsible for yet again taking advantage of Plaintiff by inducing him to share his intellectual property, which saved the Air Force a lot of time and money had it awarded a contract to a company that employed retired colonels to do the same work. However, Plaintiff is unaware of a contractor that possessed his intellectual capital at the time that it was needed. The Air Force concurred with this assessment, and this is why it relied so intensely upon the Plaintiff.

**139.** Plaintiff is thus due, at the very least, the value of the opportunity costs associated with the acquisition of the just-referenced intellectual capital, plus the accounting costs for his trip to Strategic Air Command headquarters near Omaha, Nebraska.

**Compensation Claim: $324,000**

**140.** 24. **Developed an analytical approach for assessing the time-sensitive dynamic nature of strategic target value.**

Within the overall discipline of strategic studies in general, Plaintiff focused his interests in two areas: the military uses of strategic warning time, and the design of flexible strategic options. He then applied the tenets of these two areas to force structure planning in general, and space force structure planning in particular. One of the key developments in the late 1970s and early 1980s was the codification in national security policy and guidance of the requirement for flexible strategic options. In turn, this requirement placed new and severe requirements on communication, reconnaissance and surveillance satellites. This became fact due to the time-sensitive dynamic nature of target value. Plaintiff was one of the first to recognize these new requirements for the United States' space force structure. He then developed a methodology to assist the Strategic Air Command and the Joint Strategic Target Planning Staff in assessing the viability of a particular flexible strategic option in light of the requirements that it may impose on various space assets.

141. While Plaintiff does not have any unclassified exhibits to support this specific claim, he can upon request provide a copy of his unclassified material, which was given to the two just-mentioned organizations.

142. At the very least, Plaintiff is due both the value of the opportunity cost and the accounting costs associated with the performance of this task. Given that such requirements still exist in providing security options for this country the knowledge base to which this task contributed is still in use, and therefore the statue of limitations requirements of the Court should not be an issue.

**Compensation Claim: $216,000**

**143.  25. Developed concepts for utilizing United States satellite negation assets to enhance United States strategic operations.**

In Plaintiff's aforementioned Monograph, he had one chart on the utilization of United States satellite negation systems for use against adversary satellites, particularly as a part of flexible strategic options. He was encouraged by the Air Force to embellish this intellectual property so that a more fully comprehensive evaluation of satellite negation options could be done.

**144.** Again, this is the type of intellectual property for which the Air Force contracts. But Plaintiff was far ahead of the defense contractor community in thinking about space and its implications for United States national security. As a combatant command, the Strategic Air Command was intensely interested in understanding the threats as well as the opportunities presented by space as a critical strategic arena. In turn, there were other parts of the Air Force that were overwhelmingly focused on keeping the Strategic Air Command out of space. This was out of fear that a formalization of the Strategic Air Command's roles and missions in space would adversely impact the budgets of those parts of the Air Force who opposed the Strategic Air Command's legitimate interest in space as a critical strategic arena.

**145.** Note that the part of the Air Force outside of Strategic Air Command who had billets associated with space were far more interested in their careers, their budgets, and their own roles and missions in space than they ever were in protecting this country. Unfortunately, Plaintiff got caught in the middle of this intra-service rivalry, and thus suffered greatly for his intense dedication to the defense of the United States of America. Fortunately, there was a positive outcome of this particular years-long effort, despite the politics, but the details are classified.

**146.** As a result, Plaintiff is due, at the very least, the accounting costs as well as the value of his opportunity costs that accumulated from his intellectual property on the use of satellite negation

methods and employment doctrine for satellite negation systems by United States combatant commands like the Strategic Air Command. **It is again important to note that the good people in the combatant commands requested Plaintiff's assistance as opposed to him thrusting his intellectual property upon them.**

**Compensation Claim: $288,000**

**147.** 26. **Developed operational concepts for utilizing SDI space systems to enhance United States strategic operations.**

In 1985, upon his return to **Northrop Grumman Corporation,** Plaintiff began to work on the space systems associated with the Strategic Defense Initiative (SDI), commonly referred to as "Star Wars." On his own time and at his own expense, Plaintiff began to consider how these systems could also enhance the strategic operations executed by the Strategic Air Command. This was an extension of the intellectual property that he had developed while the sole proprietor of **Strategic Systems Sciences**. The officers in Strategic Air Command /XP, which is the planning shop, were very interested in Plaintiff's concept of using SDI space systems to support strategic offensive, as well as strategic defensive forces.

**148.** Plaintiff traveled to Strategic Air Command Headquarters in December 1986 to discuss all relevant issues with the appropriate officers. An agreement was reached in which **Northrop Grumman Corporation** would invest the first $50,000 in a study, and then the Strategic Air Command would fund the remainder of a yearlong study through a funding mechanism that is not relevant to this Claim. But a **Northrop Grumman Corporation** marketing manager, feeling wounded because he did not receive the opportunity to approve this potentially new line of business, demanded that all efforts associated with task be terminated. And they were, thus leaving the good people at Strategic Air Command out on a limb with no place to turn.

**149.** Nonetheless, the Strategic Air Command once again benefited from the intellectual capital and intellectual property acquired by the Plaintiff at no cost to it. It was the Air Force's job to attempt to override the pestilence of a **Northrop Grumman Corporation** marketing manager, given that it believed that Plaintiff was pursuing concepts that would enhance the performance of the Strategic Air Command's mission. It is interesting to note that within a year of **Northrop Grumman Corporation's** termination of this task, **President Reagan** requested that alternative uses be found for SDI space systems. At that point, Plaintiff sought to revive this task, and again **Northrop Grumman Corporation** said no.

**150.** At the very least, Plaintiff should be compensated for the value of the opportunity costs inflicted upon his career by **Northrop Grumman Corporation** for pursuing a task that neither the Air Force nor **Northrop Grumman Corporation** would stand behind at the least little adversity as represented by the unprofessional conduct of a marketing manager with the reputation as a Luddite. Plaintiff should also be compensated for the acquisition of the intellectual capital that led to his development of the concepts described above.

**Compensation Claim: $144,000**

**151.** 27. **Developed arms control monitoring technology development plan.**

In 1990, Plaintiff wrote a systems engineering management plan (hereinafter SEMP) for a billion-dollar space system. He had also written three well-received national technology roadmaps, and had done an internal study on the then-future technology requirements for arms control monitoring. This was all done as an employee of **Northrop Grumman Corporation** for which Plaintiff received his weekly salary, however inferior.

**152.** As a result of these tasks, it occurred to Plaintiff that a SEMP-like plan for arms control monitoring technology was in order. At a conference on arms control, held at the State

Department in June 1990, Plaintiff approached a senior **Central Intelligence Agency** official to gauge his reaction to Plaintiff's proposal. The reaction was very positive, and the official requested that Plaintiff provide an unsolicited proposal to the **Central Intelligence Agency** as quickly as possible.

**153.** Plaintiff knew that at **Northrop Grumman Corporation** there were members of management very interested in this business area, and Plaintiff provided them with an entrée to a new line of business. But **Northrop Grumman Corporation** refused to pursue this new business opportunity.

**154.** Plaintiff is thus due, at the very least, the value of the opportunity costs associated with the acquisition of the intellectual capital necessary to accomplish this task, plus the accounting costs for all the books that he purchased to support the development of the plan.

**Compensation Claim: $216,000**

**155.** 28. **Developed the concept of secondary indicators for arms control monitoring and verification.**

In 1978, Plaintiff developed the concept of secondary indicators for the monitoring and verification process for arms control agreements like SALT I. In this timeframe, there was great concern in both the arms control community and the intelligence community that the transmitted information from Soviet ICBM tests was prerecorded data, and not the actual data associated with the missile tests. The theory was that the actual data was recorded onboard the test missile, and recovered after the missile had landed in its target area on the Kamchatka peninsula. The intelligence community put out the word that it was interested in methods that would resolve this issue.

**156.** Plaintiff developed the concept of secondary indicators that would permit an intelligence analyst to verify the data from the intercepted downlink from a test missile. His white paper on this issue led to a six-week long White House-based study group early in the Reagan administration. Plaintiff was not invited to participate in this study, most likely because it did not know that the concept had originated with him. [Or, it is possible that the purported use of Plaintiff's name in the **Central Intelligence Agency's Evil Twin Program** may have precluded his participation.] Plaintiff believes that the concept did in fact originate with him due to the unique terminology used in both his white paper, and the study group's preparation materials. Plaintiff learned of this study purely by accident, and the corporate executive who told him about it was flabbergasted because he too believed that the concept had come from the Plaintiff, again, due to the common uniqueness of the terminology.

**157.** Plaintiff once again claims that those who do the work that enhances this country's security should be the ones who receive any rewards, awards, or monies that result from their intellectual property. When that does not occur, the Government becomes liable for the losses suffered by the one who actually generated the intellectual property. In the instant case, the professor who is believed to have taken the secondary indicator concept and ran with it became a high-ranking official in the Central Intelligence Agency in the first Reagan administration. There well may have been other reasons for his appointment, but if he in fact was the one responsible for introducing this concept to the Government, it certainly did not impede his appointment to a high-level position at the **Central Intelligence Agency**. The reason Plaintiff suspects the professor is that he is the only person who knew of the Plaintiff's proposed concept prior to the establishment of the White House study group.

**158.** Since the intelligence community can still avail itself of the results of this concept, the Government is still liable for compensation to the Plaintiff. His compensation should be, at the very least, the value of his opportunity costs associated with this effort, plus an amortized amount of the accounting costs of his acquisition of the intellectual capital associated with this task, which were part of his self-designed doctoral program.

**Compensation Claim: $72,000**

**159.**  29. **Developed a SALT verification strategy based upon the concept of non-compliance specification.**

Throughout most of Plaintiff's career, he was involved in several aspects of arms control, especially the monitoring and verification processes. As a part of these endeavors, Plaintiff developed a verification strategy. This strategy was based upon the concept of specifying measures that the U. S. would take if it determined that a signatory to an arms accord had violated articles of the accord. The severity of these specifications would be based upon a host of criteria, but particularly upon the significance of the violation to United States national security. Plaintiff's thesis was that such a strategy would aid in the Senate ratification process by mitigating the fears of those senators who were generally opposed to arms control in general, and strategic arms control in particular. Plaintiff's white paper on this subject in 1979 was briefed to members of the California Seminar on Arms Control and International Security, several members of whom became senior members of the Reagan administration. Plaintiff does not know what happened to his intellectual property once it disappeared into The System.

**160.** Plaintiff's compensation claim for this intellectual property is based upon the value of his opportunity costs and the amortized accounting costs of his self-designed doctoral program, which resulted in his acquiring the intellectual capital necessary to generate the concepts found in

his white paper.

**Compensation Claim: $72,000**

**161.** 30. **Developed an easy-to-use flowchart for military strategy development.**

In 1987, after United States Space Command became very interested in Plaintiff's military space strategy intellectual property, described starting in Paragraph 91, Plaintiff decided to do a more in-depth study of what constitutes military strategy according to the experts throughout history. He read and studied numerous books and professional papers from the fall of 1987 until the end of 1989. At that point, he reduced his findings developed over this nearly two-and-a- half-year period to a flowchart with sixteen elements on it (**Exhibit 17**). The flowchart was an instant success among those that reviewed it, and one of these people, Air Force **Colonel Richard Szafranski**, purportedly sent copies of Plaintiff's intellectual property to several war colleges where it reportedly has been used extensively. Now-retired **Major General Timothy J. McMahon,** who, as a lt. colonel, worked for Colonel Szafranski, told plaintiff this**.**

**162.** Plaintiff did not get the opportunity to potentially sell his chart before the Air Force reportedly gave it away. Plaintiff does not have the means to determine the veracity of this story, and thus begs the Court's indulgence in assisting him in determining if once again the Government is benefiting from intellectual property owned by the Plaintiff, for which he was never compensated. However, Plaintiff has no reason to believe that General McMahon lied to him.

**163.** Should this accusation prove to be true, Plaintiff is due, at the very least, the value of the opportunity cost of Plaintiff's acquisition of the intellectual capital necessary to generate the flowchart, the value of the opportunity costs associated with the flowchart's development, and

| | |
|---|---|
| **8.** Developed a series of electronic warfare methods against adversary satellites to enhance strategic operations. | **$432,000** |
| **9.** Developed utilization concept for retired boosters (e.g., the THOR) to enhance U.S. strategic operations. | **$72,000** |
| **10.** Identified ten satellite relay services in support of Department of Defense roles and missions | **$432,000** |
| | |
| **11.** Developed roles and missions for SAC's Space Master Plan | **$1,440,000** |
| **12.** Provided U.S. Space Command with an approach to strategy and doctrine for military space systems, which was then implemented. | **$576,000** |
| **13.** Developed a series of space force structure planning databases | **$2,160,000** |
| **14.** Provided support to the **Central Intelligence Agency's Office of Strategic Research** and the President's National Security Advisor On the generation of the first National Intelligence Estimate (NIE) On the Soviet space  force structure. | **$144,000** |
| **15.** Briefed the Strategic Air Command's Program Evaluation Group on Space as a Critical Strategic Arena. | **$432,000** |
| **16.** Wrote the first briefing on strategic issues in space that was presented to President Reagan during his transition period | **TBD** |
| **17.** Authored the monograph "Strategic Utilization of Space Force Structures in a Protracted Strategic Conflict: A Net Assessment" | **$720,000** |
| **18.** Briefed first Air Force-wide symposium of space doctrine | **$144,000** |

| | |
|---|---|
| **19.** Developed the concept of "traceability architecture" to generate methods for evaluating and selecting reconnaissance and surveillance systems for a particular mission or set of missions | **$576,000** |
| **20.** Supported **Central Intelligence Agency /Office of Strategic Research's** critique of the proposed Multiple Protective Shelter (MPS) approach to the basing of the M-X missile. | **$144,000** |
| **21.** Developed the dynamic deterrence approach to the M-X basing problem | **$158,400** |
| **22.** Developed new strategic targeting doctrine, based upon "response in kind", which was then implemented | **$216,000** |
| **23.** Developed presumptive Soviet targeting doctrine for its ASAT system | **$324,000** |
| **24.** Developed an analytical approach for assessing the time-sensitive dynamic nature of strategic target value | **$216,000** |
| **25.** Developed concepts for utilizing U.S. satellite negation assets to enhance U.S. strategic operations | **$288,000** |
| **26.** Developed operational concepts for utilizing SDI space systems to enhance U.S. strategic operations | **$144,000** |
| **27.** Developed arms control monitoring and verification technology development plan | **$216,000** |
| **28.** Developed the concept of secondary indicators for arms control monitoring and verification. | **$72,000** |

| | |
|---|---|
| **29.** Developed a SALT verification strategy based upon the concept of non-compliance specification | **$72,000** |
| **30.** Developed an easy-to-use flowchart for military strategy development and assessment | **$259,200** |
| **31.** Developed a four-day short course on the strategic concepts used during the Cold War to develop national security policy and guidance. | **$324,000** |
| **Total Opportunity Costs for National Security Policy and Guidance Development** | **$10,641,600** |

//

## 172. MONETARY SUMMARY OF TOTAL CLAIM

| | |
|---|---|
| **Total Opportunity Costs for National Security Policy and Guidance Development Tasks** | **$10,641,600** |
| **Total Accounting Costs for National Security Policy and Guidance Development Tasks** | **$12,000** |
| **Total Fees for Funded Programs** | **$87,050,000** |
| **TOTAL CLAIM** | **$97,703,600** |

## SUMMARY OF CLAIM

**173.** We in the United States live in a country that consistently congratulates itself on being the finest country in the history of civilization. This country has many fine attributes. But a lot of them do not mean much if the fundamental necessities of a good life are beyond reach, as is the

case for many of those of us who are simply common people, or, as some self-appointed elitists call us, "the great unwashed." We are a nation of the few, by the few, and for the few, irrespective of the propaganda that one hears at national holiday celebrations. At least that is a reasonable conclusion if one spends one's career working in the National Security Establishment.

**174.** Plaintiff's own problems as a citizen of this country have been a lifetime of difficulty maintaining a lifestyle that is above the poverty line. Getting any relief for legal matters that should have been quickly adjudicated, if the U.S. had the judicial system that it tells the world is the model of fairness and enlightened jurisprudence, has led to additional problems. But, fairness in the U.S. for the common man in the defense industry appears to be just an illusion, especially for those like the Plaintiff, who has been a model citizen and a model employee every where that he has ever been employed.

**175.** For example, the Government spends a great deal of money on graduate educations for uniformed military officers. These people receive masters and doctoral degrees from some of this nation's finest institutions of higher education as well of several elite universities overseas. A graduate education is a very important element when considering an officer for promotion. But when do they use their fancy educations? Why does the National Security Establishment have to rely on people like the Plaintiff to get the really difficult jobs done? While Plaintiff would not trade his education for anything, because he went to Arizona State University, he is in fact considered to be a member of the great unwashed, and he has been told so on many occasions.

**176.** No one contributed a dime to Plaintiff's education. He paid for it himself with scholarships and loans. When he applied for a doctoral fellowship at **The Boeing Company** in the mid-1970s, there were two schools of thought among its management. One said, "Name one thing that Neil will be able to do when he comes back with a Ph'D that he can't do now." The other school of

thought was that since Plaintiff understood national security policy and guidance as well as military operations, he couldn't possibly be a good engineer, so why waste the money that his PhD program (at the University of Michigan) would cost. But clearly no one asks questions about costs to taxpayers when its comes to sending uniformed military officers to graduate school to get a Ph'D.

**177.** In the 1970s, Plaintiff interviewed three times to be an analyst on various teams that were working on strategic arms control issues. In all three cases, he was told that he would make a very fine analyst, but that he lacked the required educational credentials necessary to become a part of the team. Does that sound like an egalitarian system? Plaintiff thinks not. Also, these people knew what his credentials were before the individual interviews, so why waste everyone's time when they knew that they were not going to make an offer? Could it be that they were simply looking for some free consulting just like for the uncompensated tasks described in this Claim?

**178.** Plaintiff has had issues with the Government in the past, and has tried to mitigate his circumstances in every manner possible. Details are found in **Exhibits 20.1 through 20.4.**

**179.** Plaintiff grows weary at the lack of fundamental fairness from the those supposedly sworn to protect a system that persistently proclaims its fairness, but often times has difficulty providing the evidence of same. Should people be continued to be treated as the Plaintiff has been, he can assure the National Security Establishment that fewer **good, competent** people will want to serve such a system. Plaintiff certainly regrets all of his sacrifices for a system that constantly rewards the non-performers, and only very rarely recognizes and rewards those who get the work done.

**180.** However, Plaintiff cannot say that he was not warned. In 1973, Plaintiff worked with a national recognized authority in strategic systems sciences, **Miles Berg**. Mr. Berg told Plaintiff

that since he was so proficient at getting the work done, it was unlikely that he would ever advance very far in the defense industry. He stated that when he was in management training, the trainees were told, "promote a worker, lose a worker." He said that it was explained that management couldn't promote the really good workers because then the work would never get done. He also said that the trainees were told to never reveal this management doctrine. Plaintiff suggests that that's because the instructor believed that this practice to be illegal. Plaintiff learned the hard way that this is precisely how defense industry management functions. This training took place at **The Aerospace Corporation** in San Bernardino, California in the 1960s.

**181. Exhibit 21** contains a sample of the technologies being withheld from the National Security Establishment until procurement and personnel policies are updated to reflect a sense of fairness for those who are responsible for getting the work done. Unfortunately, the just-enacted America Invents Act is a step in the wrong direction, and it will only serve to further destroy innovation in this country in general, and in the defense industry in particular.

**182.** Why is the subject of education outlined above important to this Claim? It is because all to many military officers and defense industry managers believe that Plaintiff has been fully compensated for his intellectual property that is the subject of this Claim in that it served as the basis for the promotions, salary increases, bonuses, etc. of these self-appointed elitists. Again, Plaintiff does not have to guess about this issue; he has been told many times ("Neil, we let you do the work, what the f**k more do you want.".)

**183.** For example, on the Friday before Thanksgiving in 1988, a **Northrop Grumman Corporation** vice president, **Fred Kauffman,** told the Plaintiff that if he ever left its employ, it would sue both the Plaintiff and his new employer, because "we own your new business acquisition acumen." When Plaintiff asked him what Plaintiff got out of this capability, Mr.

Kauffman replied, "Just your weekly salary, and don't ever expect anything more." This is another example of the elitist's perspective common in the National Security Establishment.

**184.** However, in the interest of fairness, Plaintiff must say that of all of the admirals, generals and White House officials that he briefed throughout the 1980s, not one ever asked him about his educational credentials. Unlike many in the lower ranks(and in industry), these fine gentlemen were interested in getting a job done, and they were thus interested in what the Plaintiff could do to assist them.

**185.** To reiterate, Plaintiff has had issues with the Government in the past relating to its inappropriate and illegal treatment of him. Only when all of these issues are settled will Plaintiff and a host of other high-performance defense engineers consider reassuming the process of introducing highly valuable technological innovations that will further enhance United States national security. **Otherwise, these assets will likely be divested overseas.**

**186.** Plaintiff is very disappointed that he is compelled to file this Claim. But he has tried everything possible to get fair treatment from the National Security Establishment, both Governmental and private contractors, and he has been totally unsuccessful. One Air Force then-lt. colonel, **James E. Jacoby,** once told Plaintiff, "we have more lawyers than you will ever have, and we can treat you any way we want." Plaintiff hopes that the Court's decision in this Claim will convince such people that this is no longer the case.

//

### PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiff Neil F. Keehn prays that this Court grant the following relief:

A. An Order be issued by this Court to the Department of Defense, as well as any United States intelligence service that it deems appropriate, to pay Plaintiff a total amount of **$97,703,600 plus any additional monies from the To Be Determined (TBD) claim awarded by the Court** for goods and services delivered, as described herein, but for which he was never provided any compensation

B. A Declaratory Judgment be issued by this Court, to be in effect until Plaintiff dies, that states that he is an American citizen, and is thus eligible for all guarantees and civil rights, as articulated in the United States Constitution and all federal laws that pertain thereto.

C. An Order be issued granting such other and further relief as the Court deems necessary, just and proper.

Respectfully submitted,

Neil F. Keehn, Plaintiff, Pro Se

Dated this 9 day of ~~December, 2011~~
January
2012

2603 Third Street, #8

Santa Monica, California 90405

(310) 396-0622

(310) 396-0622

(facsimile)

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NEIL F. KEEHN,                )    CASE NO:
                             )
        Plaintiff             )    JUDGE:
                             )
                             )
                             )    VERIFICATION
                             )
    V.                       )
                             )
                             )
UNITED STATES,               )
                             )
                             )
        Defendant            )
                             )
                             )
                             )
                             )
                             )
                             )
                             )
                             )
                             )
                             )

I, Neil F. Keehn, plaintiff in the above captioned case, declare under the laws against perjury of the State of California and of the laws of the United States that the facts and allegations in the Claim herein are both true and correct as I know them to be.

//

Dated this 7th day of January 2012

*Neil F. Keehn*

Neil F. Keehn
Plaintiff

## LIST OF EXHIBITS

**EXHIBIT**                                                                          **PAGE**

1. **Letter from Major General David L. Grey to Neil F. Keehn,**

   **dated 15 December 1980**                                                          **E-2**

2. **Self-Designed Doctoral Program of Neil F. Keehn**                                 **E-4**

3. **Employment opportunity at General Dynamics**                                      **E-9**

4. **Letters from Lt. General George E. Miller to**

   **Neil F. Keehn and to**

   **Lt. General Robert M. Bond, both dated 8 June 1982**                              **E-12**

5. **Spacebased Multispectral/Hyperspectral Imaging hardware**                         **E-15**

6. **Space Shuttle Crisis Reconnaissance Program**                                     **E-22**

7. **Letters From Dr. Victor H. Reis to Neil F. Keehn**

   **dated 12 August 1982, and 20 April 1983**                                         **E-24**

8. **Letter from Lt. General George E. Miller to Neil F. Keehn**

   **dated 26 June 1984**                                                              **E-27**

9. **Neil F. Keehn's methodology for developing SAC's**

   **roles and missions in space**                                                     **E-29**

10. **Letter To Daniel S. Golden from Vice Admiral William E. Ramsey,**

    **dated 30 June 1987**                                                             **E-35**

11. **Letter from Brigadier General Stanford E. Brown to Neil F. Keehn**

    **Dated 24 March 1981**                                                            **E-37**

| **EXHIBIT** | **PAGE** |
|---|---|
| 12. Letter from Major Don E. Mullins to N. F. Keehn, dated 23 March 1982 | E-39 |
| 13. Flowcharts generated after Space Doctrine Symposium | E-41 |
| 14. Dynamic Deterrence approach to the M-X basing problem | E-52 |
| 15. Letter from Brigadier General Gordon E. Fornell to Neil F. Keehn, dated 24 January 1983 | E-55 |
| 16. Strategic Targeting Doctrine developed by Neil F. Keehn | E-57 |
| 17. The Elements of Military Strategy and their inter-relationship | E-59 |
| 18. Letter from Air Force Global Strike Command to Neil F. Keehn, Undated | E-61 |
| 19. Description of contract purportedly awarded to Northrop Grumman Corporation | E-63 |
| 20. Previous Problems with the United States Air Force | E-65 |
| 20.1. Improper and Illegal Procurement Practices by the United States Air Force in the case of Strategic Systems Sciences | E-67 |
| 20.2 The illegal sale of a highly classified United States reconnaissance satellite to the People's Republic of China | E-88 |
| 20.3 The Central Intelligence Agency's Evil Twin Program and the purported use of Neil F. Keehn's name in that Program | E-98 |
| 20.4 Theft of Neil F. Keehn's 1989 Government-awarded GainSharing bonus | E-113 |

//

**EXHIBIT**                                                                 **PAGE**

**21.   Executive Summary of technologies being withheld from the National**

     **Security Establishment**                                          E-122